UNITED STATES of America, Plaintiff,

v.

CHARLES GEORGE TRUCKING CO., INC., Charles George, Sr., Dorothy George, James George, Charles George, Jr., Dorothy Lacerte, Trustee, and Ernest Dixon, Jr., Trustee, Defendants.

COMMONWEALTH OF
MASSACHUSETTS,
Plaintiff,

v.

CHARLES GEORGE TRUCKING CO., INC., Charles George Land Reclamation Trust, Charles George Sr., Dorothy G. George, James George, Charles George, Jr., Dorothy G. Lacerte, Trustee, and Ernest G. Dixon, Jr., Trustee, Defendants.

Civ. A. Nos. 85–2463–WD, 85–2714–WD.

United States District Court,
D. Massachusetts.

March 31, 1988.

Colene Gaston, Asst. U.S. Atty., Joseph J. McGovern, Dept. of Justice, Environmental Enforcement Section, U.S. Dept. of Justice, Washington, D.C., for U.S.

William F. Macauley, Craig and Macauley, Boston, Mass., for defendants.

Bruce F. Smith, Boston, Mass., for Charles George Sr., Charles George Trucking Co.

Richard E. Bachman, Hale, Sanderson, Byrnes & Mortor, Boston, Mass., for Dorothy George, Dorothy Lacerte.

Laurence M. Johnson, Michael D. Chefitz, Johnson & Schwartzman, Boston, Mass., for Charles George Trucking Co.

Margaret E. Sheehan, Asst. Atty. Gen., Environmental Protection Div., Boston, Mass., for Com. of Massachusetts.

Richard L. Fox, Carragher, Fox and Lampert, Chelmsford, Mass., for Ernest G. Dixon, Jr.

## MEMORANDUM

WOODLOCK, District Judge.

The Attorney General of the United States, acting on behalf of the federal Environmental Protection Agency ("EPA"), has moved, pursuant to 42 U.S.C. § 9604(e)(5), for an order in aid of immediate access to the Charles George Land Reclamation Trust Landfill ("the Site"), and various parcels of land adjacent to the Site.

The Site is a hazardous waste dump in the towns of Tyngsboro and Dunstable, Massachusetts, owned by the defendants. The United States alleges that immediate access is necessary to allow EPA, the Massachusetts Department of Environmental Quality Engineering ("DEQE"), and their authorized representatives, to conduct remedial activities under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act ("SARA") Pub.L. No. 99-499, 100 Stat. 1613 (October 17, 1986).

The motion is opposed by defendant James George, one of the owners of the Site,[1] and by defendant Dorothy Lacerte, as Trustee of the 475 Dunstable Road Realty Trust and as Trustee of the Hunter Realty Trust—the holders of adjacent parcels to which the United States also seeks immediate access.

### I.

The federal litigation of which the present motion is the most recent component was commenced in 1985. On June 13th of that year the United States filed a

---

1. James George and other members of his family own the Site. The Georges operated the Site essentially as a family business from 1971–1983. Between 1973 and 1976 large quantities of organic and metallic hazardous substances were disposed at the Site pursuant to a permit the Georges had received from the Massachusetts Division of Pollution Control ("DPC"). From 1976–1982, defendant The Charles George Trucking Co., Inc. was licensed by DPC to haul hazardous substances, at least some of which it transported to the Site for disposal.

On April 26, 1982, the Tyngsboro Board of Health ordered the Site closed, effective May 4, 1982, until it could be brought into compliance with the Order of Conditions that the Board issued. Litigation followed in Massachusetts Superior Court, which resulted in a June 1983 court order closing the Site.

After the issuance of the June 1983 state court order, the Site was abandoned by the defendants. It has remained abandoned, except for the presence of DEQE which has installed, operated and maintained a leachate recirculation system to control leachate run-off at the Site. (Leachate is water that becomes contaminated when rain, melted snow, groundwater or surface water percolate through a landfill and come into contact with waste material.)

four-count Complaint—Civil Action No. 85–2463–WD—pursuant to CERCLA and the Resource Conservation and Recovery Act, 42 U.S.C. § 6928, against the Georges and various other defendants.[2] On July 1, 1985, the Commonwealth of Massachusetts filed a Complaint on behalf of DEQE against the same defendants—Civil Action No. 85–2714–WD—seeking, *inter alia*, costs associated with the Commonwealth's response measures at the Site.[3] The two actions were consolidated on October 2, 1985, by Judge Garrity, to whom this case was previously assigned.

The access issue which is the subject of the instant motion was raised in Count 3 of the original June 1985 Complaint by the United States. However, unlike other issues in the case—which have already made their way to the First Circuit, *United States v. Charles George Trucking Co.*, 823 F.2d 685 (1st Cir.1987)—the access claim has not, until now, been actively contested in court.

The commencement of this litigation followed years of prior investigation during which EPA had determined that hazardous substances were being released from the Site. EPA's first involvement with the Site occurred in September 1980 when DEQE requested EPA assistance in evaluating conditions at the Site.[4]

In July 1982, EPA assigned the NUS Corporation to develop a Remedial Action Master Plan ("RAMP") for the Site. The RAMP was completed in November 1983, and became the primary planning document for all removal activities at the Site. Between the publication of the RAMP and the commencement of this action, EPA and DEQE did not stand idle. Their activities included:

Fencing the Site; maintaining and operating the existing leachate recirculation system; providing a temporary, and later a permanent, portable water supply to residents of the Cannongate Condominium complex (located approximately 800 feet south of the Site) whose wells were and are contaminated by hazardous substances from the Site; installation of monitoring wells at and around the Site; and surface and groundwater sampling at and around the Site. Additionally, EPA ... commissioned numerous studies to determine the scope of the various problems posed by the Site, and how those problems may be remedied.

In 1984, EPA's contractor [NUS] began a Source–Control Feasibility Study. The objective of the study was to identify environmentally sound, cost-effective, long-term alternatives to contain contamination on-site and simultaneously to minimize off-site environmental impacts created by the continuous releases of hazardous substance from the Site into the adjacent groundwater and surface water. The study was completed in 1985, and it identified a number of alternative solutions. On July 11, 1985, following publication of the study and receipt and analysis of public comments on the alternatives identified, EPA issued its Record of Decision ["ROD"].

Memorandum of Points and Authorities in Support of United States' Motion for an Immediate Order in Aid of Access ("United States' Memorandum") at 5–6.

The ROD was the culmination of the administrative decision-making process fol-

2. The Complaint sought: (1) reimbursement of costs incurred by EPA in undertaking a remedial response at the Site; (2) a declaratory and injunctive relief against certain allegedly fraudulent real estate conveyances; (3) an order granting EPA access to the Site; and (4) an order directing response to EPA information requests and assessment of civil penalties for failure to do so.

3. The Commonwealth alleges: (1) entitlement to cost recovery under CERCLA; (2) entitlement to cost recovery under Mass.Gen.L. ch. 21E; (3) entitlement to assessment of civil penalties against the Charles George Trucking Co. for violations of hazardous waste regulations prom-

ulgated under Mass.Gen.L. ch. 21; (4) nuisance; (5) negligence; (6) entitlement to common law restitution; and (7) fraudulent conveyances by Charles George, Sr., Dorothy George, Dorothy G. Lacerte, and Ernest G. Dixon, Jr.

4. As early as 1976, DEQE had become involved in efforts to regulate the Site. During that year DEQE initiated a state court action against many of the current defendants alleging violations of Massachusetts law governing solid waste and hazardous waste disposal and management, water pollution, and wetland protection.

lowed by EPA in selecting remedial alternatives for sites listed on the National Priorities List ("NPL"), the list of those facilities nationwide at which releases or threatened releases of hazardous substances pose the greatest risk.[5] The ROD estimated that over 9,300 pounds of volatile organic compounds and over 188,000 pounds of toxic heavy metals annually migrate from the Site via the landfill's leachate. The ROD's selected remedy consisted of a full synthetic membrane cap with a surface water diversion and collection system entering to the atmosphere, and a full peripheral leachate collection system. The estimated cost of constructing the remedy is $16,000,000, and the estimated construction time is 500 working days.

Following the publication of the ROD and the initiation of this litigation, the United States contracted for design of the specifications for the implementation of the ROD's recommended remedy. The design was completed and approved in December 1987. With the approval of the design specifications, the U.S. Army Corps of Engineers, acting pursuant to an Interagency Agreement it had entered into with EPA, issued an invitation for bids for construction of the source-control remedy.

Meanwhile, beginning in May 1987, DEQE made repeated efforts to secure a written agreement from James George and Dorothy George for access to the Site. DEQE's requests were rejected by the Georges. On October 6, 1987, EPA intervened and wrote to the defendants requesting permission to enter the Site and the adjacent parcels for the purpose of constructing the remedy. The defendants entered into negotiations with EPA in an effort to resolve the access issue short of litigation.

During these negotiations, the principal reason presented by the defendants for denying access to the Site was that the remedy provided for in the ROD and its implementation design would work to exclude the defendants from the Site. The defendants maintained that EPA's remedy and

design could effectively work a "taking" of their property and might make it impossible for them to develop a methane recovery program which they allege to be environmentally sound and which they estimate to be capable of generating in excess of $2,000,000 over the next 20 years, money which could be used to defray clean-up costs.

The United States informed the Georges, during the course of negotiations, that EPA and its contractors are currently developing a Feasibility Study which "will identify environmentally sound, cost-effective, long-term remedial alternatives for *off-site contamination control* specifically including control of methane and other gases being vented from the Site." United States' Memorandum at 9 n. 5. (original emphasis). That Feasibility Study is scheduled to be completed this Spring,[6] at which time "it will be published, and interested persons will have an opportunity to comment on each of the alternatives identified. Following receipt and analysis of such comments, EPA will issue another ROD, selecting a remedy for off-site contamination control." *Id.* EPA has invited the Georges to submit any and all proposals they may have for methane recovery to EPA for consideration as part of the Feasibility Study. EPA has suggested that the Georges' cooperation could result in the accommodation of the Georges' methane recovery goals with the EPA's other clean-up plans.

The Georges have not, however, submitted any methane recovery proposals to EPA. Instead they broke off negotiations on February 2, 1988, and informed EPA that they would not consent to EPA's access request. As a result, the United States turned to this court, pursuant to 42 U.S.C. § 9604(e)(5)(B), with the instant motion for an immediate order in aid of access.

The United States has offered three reasons for the urgency of its request:

■ any delay in the commencement of construction will exacerbate the environmental problems that now exist as a re-

---

5. The Site was placed on the NPL in 1983.

6. A draft Remedial Investigation and a draft Feasibility Study concerning off-site migration

has been prepared for EPA by E.C. Jordan Co. These documents are currently being circulated within EPA for review.

sult of hazardous substances continuously leaching from buried wastes on the Site ...;

■ competitive bids for the remedial work to be performed on the Site have been solicited, and bids received are scheduled to be opened on March 17, 1988.[7] Unless an order for access is obtained before that date, the Army Corps of Engineers (which serves as EPA's procurement agent on this project) will not open the bids, and award of the contract will be delayed. Should this happen, the United States may be subject to claims for damages arising from bid preparation costs, among other things;

■ even a relatively short delay in awarding the contract may result in major modifications of the construction schedule due to regional weather conditions, ... [which] will inevitably increase the costs of the project.

United States' Memorandum at 2–3.

## II.

The United States maintains that the role to be played by a court in assessing a motion such as the one now before me is quite limited. According to the United States, 42 U.S.C. § 9604(e)(1) authorizes EPA to take "any response action"[8] under CERCLA "at a vessel, facility, establishment, place, property, or location, ... if there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant." The United States contends that when EPA has determined that there is such a "reasonable basis," it is then authorized under 42 U.S.C. § 9604(e)(3) to enter the alleged pollution source "to determine the need for response or the appropriate response or to effectuate a response action under this title [CERCLA]."[9] Finally, should the owner of the property to which EPA requests entry deny consent, the United States contends EPA may, pursuant to 42 U.S.C. § 9604(e)(5), either seek an administrative order to prohibit interference with entry, or come directly to court to obtain compliance with its request for entry.[10]

In this case, EPA has chosen to bypass the administrative avenue and to come directly to this court with its instant motion for an immediate order in aid of access. The United States maintains that in consid-

---

7. The U.S. Army Corps of Engineers has rescheduled the date for the opening of bids to April 5, 1988. *See* Affidavit of Robert K. Zaruba at paragraph 7, attached to United States' Reply to Defendants' Supplemental Memorandum in Opposition to Motion for an Immediate Order In Aid of Access. Mr. Zaruba is the U.S. Army Corps of Engineers Project Manager for the Charles George Landfill Superfund Site Cleanup Project.

8. Under CERCLA, "response action" is expansively defined. "The terms 'respond' and 'response' means remove, removal, remedy, and remedial action, all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C. § 9601(25). There is no doubt that the term "response action," as used in § 9604(e)(1) contemplates the type of remedial action EPA and DEQE seek to perform upon the Site and adjacent properties.

9. Section 9604(e)(3) provides in full:
Entry. Any officer, employee, or representative described in paragraph (1) is authorized to enter at reasonable times any of the following:
(A) Any vessel, facility, establishment, or other place or property where any hazardous substance or pollutant or contaminant may be or has been generated, stored, treated, disposed of, or transported from.
(B) Any vessel, facility, establishment, or other place or property from which or to which a hazardous substance or pollutant or contaminant has been or may have been released.
(C) Any vessel, facility, establishment, or other place or property where such release is or may be threatened.
(D) Any vessel, facility, establishment, or other place or property where entry is needed to determine the need for response or the appropriate response or to effectuate a response action under this title.
The Site at issue here indisputably falls within each of these four categories.

10. Section 9604(e)(5) provides in full:
Compliance orders.
(A) Issuance. If consent is not granted regarding any request made by an officer employee, or representative under paragraph (2), (3), or (4), the President may issue an order directing compliance with the request. The order may be issued after such notice and opportunity for consultation as is reasonably appropriate under the circumstances.
(B) Compliance. The President may ask the Attorney General to commence a civil action

ering the present motion, the scope of review is quite narrow and the standard of review quite deferential. According to the United States, the only issues to be resolved here are:

> 1) whether entry is sought for an authorized purpose; 2) whether the request or order has been issued by an authorized representative of the President; 3) whether the place at which entry is sought is one of the places to which entry is authorized; and 4) whether EPA had a reasonable basis to believe that there may be a release or threatened release of a hazardous substance, pollutant or contaminant.

Plaintiff's Supplemental Memorandum in Support of United States' Motion for an Immediate Order in Aid of Access ("Plaintiff's Supplemental Memorandum") at 5 n. 3.

In assessing the reasonableness of EPA's determination of "a release or threatened release" from the Site, the United States contends, the court must simply defer to EPA unless it finds that conclusion to have been "arbitrary and capricious." *Id.* at 13–15.[11] Once it is determined that EPA had a reasonable basis to believe that there may be a release or threatened release from the Site, the court may not, in the view of the United States, condition EPA's right to entry in any way whatsoever.[12]

## III.

Here there is no doubt, and, in fact, no dispute that: (1) the entry sought is for the

---

to compel compliance with a request or order referred to in subparagraph (A). Where there is a reasonable basis to believe there may be a release or threat of a release of a hazardous substance or pollutant or contaminant, the court shall take the following actions:

(i) In the case of interference with entry or inspection, the court shall enjoin such interference or direct compliance with orders to prohibit interference with entry or inspection unless under the circumstance of the case the demand for entry or inspection is arbitrary and capricious, an abuse or discretion, or otherwise not in accordance with law.

(ii) In the case of information or document requests or orders, the court shall enjoin interference with such information or document requests or orders or direct compliance with the requests or orders to provide such information or documents unless under the circumstances of the case the demand for information or documents is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

The court may assess a civil penalty not to exceed $25,000 for each day of noncompliance against any person who unreasonably fails to comply with the provisions of paragraph (2), (3), or (4) or an order issued pursuant to subparagraph (A) of this paragraph.

**11.** *See, e.g., Dickerson v. Administrator, EPA,* 834 F.2d 974, 977 (11th Cir.1987); *United States v. Iron Mountain Mines, Inc.,* No. S–87–1189 (E.D.Cal.1987); *United States v. Long,* No. C–1–87–167 (S.D.Ohio 1987); *United States v. Western Processing Company, Inc.,* No. C83–252M (W.D.Wash.1986).

**12.** Under 42 U.S.C. § 9613(h),

> [n]o Federal court shall have jurisdiction under Federal law other than under section 1332

of title 28 of the United States Code ... to review any challenges to removal or remedial action selected under section 104 (42 USCS § 9604), ... in any action except one of the following:

(1) An action under section 107 [42 USCS § 9607] to recover response costs or damages or for contribution.

(2) An action to enforce an order issued under section 106(a) [42 USCS § 9606(a) ] or to recover a penalty for violation of such order.

(3) An action for reimbursement under section 106(b)(2) [42 USCS § 9606(b)(2) ].

(4) An action under section 310 [42 USCS § 9659] (relating to citizens suits) alleging that the removal or remedial action taken under section 104 [42 USCS § 9604] or secured under section 106 [42 USCS § 9606] was in violation of any requirement of this Act. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

(5) An action under section 106 [42 USCS § 9606] in which the United States has moved to compel a remedial action.

The United States contends that none of these exceptions are applicable in this case. Defendants dispute this contention by noting that plaintiff's complaint includes a claim under Sec. 9607 to recover response costs—*see* Complaint, Count I, paragraphs 27–47. Consequently, defendants maintain, "[t]his *is* an action under section 9607, and the court therefore has jurisdiction to review challenges to the government's proposed remedial action [under the Section 9613(h)(1) exception to the general prohibition of review]." Memorandum of James George in Opposition to Motion of United States for an Immediate Order of Access ("George Memorandum") at 17 n. 8 (original emphasis).

authorized purpose of remediation; (2) the request for entry has been issued by EPA, which is a properly authorized representative of the President; (3) the Site is a place where entry is authorized under § 9604(e)(3); and (4) EPA has a reasonable basis to believe that hazardous pollutants and contaminants have been and will continue to be released from the Site. Consequently, the United States maintains, I am obligated to issue an order forthwith prohibiting interference with entry of the Site and adjacent properties.

The defendants have raised four basic issues in opposition to the United States' motion:

(A) They maintain that I do not have jurisdiction under § 9604(e)(5) to consider the instant motion, because the United States did not obtain an administrative order for entry before filing their motion. Defendants contend that under § 9604(e)(5), a court may direct compliance with a previously issued administrative order of entry, but it may not simply order entry without a prior administrative order.

(B) They maintain that even if a court can issue an original order of entry, i.e. even if a court is not restricted to ordering compliance with a previously issued administrative order, it may not issue an order of exclusion. They maintain that the remedy the government seeks to implement through entry upon the Site would effectively exclude defendants from their property, and thereby constitute a taking of their property. They acknowledge that if the government wants to "take" the Site, it has the power to do so; but they maintain that the taking must be pursued according to the procedures set out in 42 U.S.C. § 9604(j), and may not proceed under § 9604(e).

(C) They maintain EPA's proposed remedy is not cost-effective.

(D) Dorothy Lacerte maintains that the remedy sweeps too broadly by encroaching upon appurtenant parcels not part of the Site itself.

I will consider the four issues raised by the defendants in that sequence.

## A. Jurisdiction under § 9604(e)(5)

The question whether a federal district court, acting pursuant to § 9604(e)(5), may issue an order to prohibit interference with entry—without a prior administrative order—appears to be one of first impression. The parties have not supplied—and research has not uncovered—any reported decision that directly addresses this question.

To be sure, as the United States has correctly observed, numerous courts have apparently issued precisely the type of order the government is seeking here without a prior administrative order of entry. *See e.g., Dickerson v. Administrator, EPA,* 834 F.2d at 976; *United States v. Iron Mountain Mines,* No. S–87–1189 (E.D.Cal. 1987) [available on WESTLAW, 1987 WL 46792]; *United States v. Long,* No. C–1–87–167 (S.D.Ohio 1987); *United States v. Western Processing Co.,* No. C83–252M (W.D.Wash.1986). However, none of these courts expressly addressed the issue raised by the defendants. The decisions have simply proceeded upon the assumption that there is authority to order entry without a prior administrative determination, i.e., that authority under § 9604(e)(5) is not limited to ordering compliance, in an enforcement proceeding, with a previously issued administrative order of entry. The defendants here have challenged this unarticulated assumption. Consequently, I must determine whether the assumption is in error.

### 1. The Statute on its Face

To answer the question, I look first to the language of the statutory provision. *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) ("In determining the scope of the statute, we look first to its language"). As the First Circuit explained in ruling on another component of this litigation:

Where ... that language points unerringly in a single direction, and produces an entirely plausible result, it is unnecessary—and improper—to look for other signposts or to browse in the congressional archives.... So long as the statutory language is reasonably definite, that

language must ordinarily be regarded as conclusive (at least in the absence of an unmistakable legislative intent to the contrary).

*United States v. Charles George Trucking,* 823 F.2d at 688 (citations omitted).

In the case of § 9604(e)(5), the language is not quite "clear as a bell," *id.*, nor does it "point[ ] unerringly in a single direction." *Id.* However, the literal words of the provision are "reasonably clear," do not "create ambiguity," and the provision's "melody is unmuffled by any discordant legislative undertone." *Id.* at 688–689.

 The "reasonably clear" meaning of the provision is the one urged upon me by the government. Traditional principles of statutory construction cause me to conclude that when consent is not granted to an entry authorized by § 9604(e)(3), the United States, acting pursuant to § 9604(e)(5), has the option of EITHER obtaining an administrative order of entry and then proceeding to federal district court in an enforcement proceeding to obtain compliance with that order, OR proceeding directly to federal district court to obtain an original court order enjoining interference with an authorized request for entry.

Section 9604(e)(5) is denominated "Compliance orders." It provides in relevant part:

(A) Issuance. If consent is not granted regarding any *request* [properly made for entry under § 9604(e)(3) ] ..., the President [acting through the Administrator of EPA] may issue an *order* directing compliance with the request. The order may be issued after such notice and opportunity for consultation as is reasonably appropriate under the circumstances.

(B) Compliance. The President [acting through EPA] may ask the Attorney General to commence a civil action to compel compliance with a *request or order* referred to in subparagraph (A). Where there is a reasonable basis to believe there may be a release or threat of a release of a hazardous substance of

pollutant or contaminant, the court shall take the following actions:

(i) In the case of interference with entry or inspection, the court shall *enjoin such interference or direct compliance with orders* to prohibit interference with entry or inspection....

(ii) In the case of information or document requests or orders, the court shall *enjoin interference with* such information or document *requests or orders or direct compliance with* the *requests or orders* to provide such information or documents.... [Emphasis supplied.]

Under subparagraph (B), the United States is authorized "to commence a civil action to compel compliance with a request or order referred to in subparagraph (A)." The use of the word "or" in this context is reasonably definite. It unambiguously authorizes the United States to come directly to this court seeking compliance with a "request" to which consent has not been granted; or the United States may come here seeking enforcement of an administrative order issued after notice and opportunity for consultation. The use of "or" in this quoted portion of subparagraph (B) does not make obtaining an administrative order a precondition for bringing the instant action.

The use of the word "or" between the phrases "enjoin such interference" and "direct compliance with orders" in subparagraph (B)(i), also supports this construction. Subparagraph B(i) unambiguously authorizes a court to enjoin interference with entry, OR to direct compliance with a previously given administrative order. It certainly does not restrict jurisdiction to the directing of compliance with previously issued orders only.

Of course, the fact that "[i]n the case of information or document requests" under subparagraph (B)(ii), a court is empowered to "direct compliance with ... requests or orders," whereas "[i]n the case of interference with entry" under (B)(i), a court is empowered to "direct compliance [merely] with orders," introduces a hint of ambiguity into deconstruction analysis by set-

ting up a lack of parellelism between the two subparagraphs. However, this modest linguistic asymmetry is insufficient to call into doubt the reasonably clear meaning of § 9604(e)(5) construed as a whole. Certainly, it does not alter the language of B(i) which enables a court to enjoin interference irrespective of whether an administrative order has been obtained before invocation of the court's equity powers is sought.

Courts should " '. . . resort to the legislative history and other aids of statutory construction only when the literal words of the statute create ambiguity or lead to an unreasonable interpretation.' " *Massachusetts Financial Services, Inc. v. Securities Investor Protection Corporation*, 545 F.2d 754, 757 (1st Cir.1976), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977) (quoting *Araya v. McLelland*, 525 F.2d 1194, 1195–96 (5th Cir.1976). The hint of ambiguity suggested by the lack of parallelism in the subsections of § 9604(e)(5) would not ordinarily be sufficient to make it appropriate "to browse in the congressional archives." *Charles George Trucking*, 823 F.2d at 688. However, to satisfy myself that the construction of § 9604(e)(5) apparent on the face of the statute is reasonable and "produces an entirely plausible result," *id.*, I have examined underlying legislative materials.

### 2. The Statutory Purpose

The First Circuit recently examined CERCLA's legislative history, *see Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081–1882 (1st Cir. 1986), and has provided guidance through an area "shrouded in mystery." *Id.* at 1081. In *Dedham Water Co.*, the Court identified

two essential purposes that Congress had in mind when designing CERCLA . . .:

First, Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal. Second, Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.

*Id.* at 1081 (quoting *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1112 (D.Minn.1982)).

The second of these "essential purposes" is not material to the issue of the proper interpretation of § 9604(e)(5). However, the first "essential purpose" is intensely relevant, and the interpretation of § 9604(e)(5) which provides the government with optional routes to the courthouse is consistent with that purpose. Indeed, interpreting § 9604(e)(5) to provide EPA with the flexibility of either obtaining an administrative order for entry *or* bypassing the administrative path and coming directly to the federal district court to enjoin interference with entry, is the only interpretation consistent with Congress's essential purpose of giving the government the "tools necessary for a prompt and effective response" to the enormous problems associated with hazardous waste disposal. Flexibility of response is just the type of "tool" that is necessary to effectuate Congress's purpose. On the other hand, the crabbed construction of § 9604(e)(5) urged by the defendants would constrict the broad efforts of Congress to assure that hazardous waste cleanups proceed as expeditiously as feasible.

### 3. The Statute's Legislative History and Related Provisions

The contention that Congress intended in § 9604(e)(5) to provide EPA with optional routes to obtain compliance with legitimate requests for entry is further evidenced by: (a) the legislative history of § 9604(e)(5) itself; and (b) the provisions for optional enforcement routes in other sections of CERCLA, as well as in other environmental statutes.

(a) Prior to the 1986 reauthorization of CERCLA, a House–Senate Conference Committee met to resolve differences between the House and Senate versions of the proposed CERCLA amendments. Site access was one of the issues over which the

House and Senate had disagreed. The Senate's version provided only for enforcement of access orders and not requests, whereas the House provision called for judicial enforcement of either. The Conference Committee selected the House version and stated in its Report that the House language authorized enforcement of requests *or* orders. The Report explained that

> [p]aragraph (5) outlines the authority of the Administrator to issue compliance orders and to request the Attorney General to commence civil action to compel compliance with such orders *or* requests for information or access pursuant to this section.

Conference Report 99–962, 99th Cong.2nd Sess. 196, U.S.Code Cong. & Admin.News 1986, pp. 2835, 3289 (emphasis supplied). The paragraph 5 which emerged from the Conference Committee became § 9604(e)(5) without amendment. It is apparent that those in the Congress principally concerned with the statute's language considered the issue and adopted the position now urged on me by the Attorney General.

(b) The alternative enforcement mechanisms available to EPA under § 9604(e)(5) are typical of the enforcement options that exist in other sections of CERCLA, as well as in other environmental regulatory provisions. *See, e.g.,* 42 U.S.C. § 9606(a) (EPA authorized, upon a determination that there may be an imminent and substantial endangerment to public health and welfare or the environment because of a release or threatened release of hazardous substances from a facility, either to proceed immediately to court to secure such relief as may be necessary, *or* to issue such orders as may be necessary to protect public health, welfare and the environment). *See also* the Federal Water Pollution Control Act (the "FWPC Act"), 33 U.S.C. §§ 1251–1342, especially § 1319;[13] *United States v. City of Colora-*

*do Springs,* 455 F.Supp. 1364, 1366 (D.Colo.1978) ("The enforcement provision of that statute [the FWPC Act] is ... drafted in the alternative. Given the nature of the public interest involved and given the absence of clear statutory support for defendant's position [that federal enforcement could commence only after the violator and the State had been notified pursuant to § 1319(a)(1)], this court is most reluctant to fashion a judicially created threshold barrier to suit such as the one suggested by defendant"). The use of alternative nonexclusive methods of securing a remedy is a familiar feature of federal environmental law and any departure from that usage would undoubtedly have drawn explanatory comment in the legislative materials. That no such explanation was given suggests that no such departure was anticipated.

### 4. The Statute's Inherent Logic

It may be argued that the construction I explicitly give § 9604(e)(5) reduces the administrative order option to a nullity, because given the choice between (1) issuing an administrative order directing compliance with a previously refused request for entry, and (2) proceeding immediately into district court to enforce a request, EPA will always opt for the latter. This argument, however, is specious. As the United States has explained,

> the agency may ... choose to issue an order in situations where time is not of the essence or where it has reason to believe that to do so will result in compliance. Similarly, if a party agrees to granting EPA access, the agency may wish to formalize that agreement in the form of an order.

Plaintiff's Supplemental Memorandum at 6.

Moreover, it may be inappropriate for the EPA to proceed directly to district

---

**13.** Section 1319 of the FWPC Act is denominated "Enforcement." It provides in relevant part:

(a) State enforcement; compliance orders.
(1) Whenever, on the basis of any information available to him, the Administrator finds that any person is in violation of any condition or limitation which implements [certain sections] of this Act ... he shall notify the

person in alleged violation and such State of such finding. If beyond the thirtieth day after the Administrator's notification the State has not commenced appropriate enforcement action, the Administrator *shall issue an order* requiring such person to comply with such condition or limitation *or shall bring a civil action....* [Emphasis supplied.]

court to enforce an entry request in cases where the administrative setting could provide "notice and opportunity for consultation," § 9604(e)(5)(A), to affected property owners, and where an administrative order would be helpful in clarifying exactly what entry would entail. But this is not such a case.

■ Here the defendants concede that they have received "notice" and have been adequately consulted. *See* George Memorandum at 8 n. 5. In addition, even a cursory review of the 1985 ROD and the 1987 implementation design shows precisely what entry will entail. Any uncertainty that concerns the defendants with respect to potential methane recovery, exists because EPA is still considering "cost-effective, long-term remedial alternatives for *off-site contamination control* specifically including control of methane and other gases being vented from the Site." United States' Memorandum at 9 n. 5. *See also* note 6 *supra* and accompanying text. A prior administrative order for entry in this case would not have clarified that issue.

The instant motion does not present what the defendants regard—*see* George Memorandum at 16–17—as the paradigm of the case in which an administrative order is and ought to be a prerequisite for district court jurisdiction under § 9604(e)(5). To the contrary, this is the paradigm of the case demonstrating why EPA must be able to come directly to federal court to obtain an order directing compliance with a request 'for entry. The retention of an administrative order in this case would not have provided the defendants or this court with anything more than we already possess. It would have been a useless formality. It would have caused unnecessary delay, without providing any countervailing

benefit. Indeed, the previous history of this case suggests that delay is the short term if not ultimate goal of the defendants. Their "stalling tactic[s]," "play[ing] ostrich" and fundamentally "struthious" strategy are already the subject of a reported sighting by the First Circuit. *United States v. Charles George Trucking Co.,* 823 F.2d at 690. Nothing in the statute justifies restricting EPA's available methods of responding to such a property owner's refusal to consent to entry.

Having reviewed the statue from all available perspectives, I conclude I have jurisdiction under § 9604(e)(5)(B) to consider EPA's motion for an order in aid of access, and I must turn to the second ground of the defendants' opposition.

B. *Entry as "Taking"*

■ The defendants contend that even if § 9604(e) authorizes government "entry" of their property, it does not authorize the government to exclude them from the property. The entry contemplated by this Motion, defendants contend, amounts to a taking.

The defendants acknowledge that if the government wants to take their property, it may. They maintain, however, that under CERCLA the exclusive mechanism for the taking of property is provided in § 9604(j),[14] and that since the United States has not brought the instant motion pursuant to § 9604(j)—and, in any event, has not complied with the procedural prerequisites of § 9604(j)—its motion should be denied. The defendants assert that to allow the United States to enter and effectively "take" their property pursuant to a statutory provision that does not authorize a taking, would place the defendants in danger of not being able to recover just compensation for their property.[15]

---

**14.** Section 9604(j) was added to CERCLA as part of the 1986 amendments. It provides in relevant part:

Acquisition of property.
(1) Authority. The President is authorized to acquire, by purchase, lease, condemnation, donation, or otherwise, any real property or any interest in real property that the President in his discretion determines is needed to conduct a remedial action under this Act. There

shall be no cause of action to compel the President to acquire any interest in real property under this Act.....

**15.** In support of this contention the defendants cite *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 866, 96 L.Ed. 1153 (1952) where the court maintained that "the right to recover in the Court of Claims on account of properties unlawfully taken by government officials for public use" is in

The defendants' contention that § 9604(j) is the exclusive means available in CERCLA for the government formally to take property is correct. However, before the government needs to invoke § 9604(j), it must intend to take the subject property; it must determine that a "taking" is necessary to conduct a remedial action under CERCLA. If the government determines that it can perform the necessary remedial action without acquisition of the subject property, it need not "take" the property, and "[t]here shall be no cause of action to compel the President [i.e. EPA] to acquire any interest in real property under [CERCLA]." § 9604(j)(1).

The government here does not profess to "take" the defendants' property. It appears to have determined that the necessary remediation can be performed on the Site without the need to acquire the property. The defendants' opposition to this determination is in effect a counterclaim to compel the United States to acquire their property. It is, in other words, the cause of action explicitly renounced by § 9604(j)(1).

The United States is seeking to enter the defendants' property for purposes of remediation. To be sure the proposed remedy is wide-ranging; it may even work a taking of the defendants' property by something akin to inverse condemnation. However, the United States' motion plainly seeks the type of remedy contemplated by §§ 9604(e)(1) & (3), which authorize entry onto subject properties "for the purpose of determining the need for response, or choosing or *taking any response action* under this title or otherwise enforcing the provisions of this title." § 9604(e)(1) (emphasis supplied). *See also* § 9601(25). If the implementation of the remedy works an effective taking of the defendants' property, the defendants may have a justiciable claim that they will be able to pursue in the Claims Court, pursuant to the Tucker Act, 28 U.S.C. § 1491. They do not, however, have grounds to oppose this motion.

## C. *Cost Effectiveness*

The defendants raise an additional contention, closely related to their § 9604(j) taking argument. They maintain that if the case is properly before me under § 9604(e), I should not enjoin their interference with EPA's request for entry, because the request is "not in accordance with law." EPA's proposed remedy, which provides the basis for the entry request, is not in "accordance with law" as required by § 9604(e)(5)(B)(i), according to the defendants, because it is not "cost-effective" as required by 42 U.S.C. § 9604(a)(7).[16]

The defendants assert that the remedy is not cost-effective because the synthetic cap that the remedy calls for will be more costly and less effective than a cap constructed of compacted glacial till.[17] They also maintain that insofar as the remedy

"doubt." Here, however, it is apparent that the government's entry upon the defendants' property would be lawful. Accordingly, any subsequent "taking" that results from the lawful entry would also be lawful. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 n. 19, 104 S.Ct. 2862, 2880 n. 19, 81 L.Ed.2d 815 (1984) (under 7 U.S.C. § 136 *et seq.*, "[a]ny taking of private property that would occur as a result of EPA disclosure or consideration of data ... [which the EPA is duly authorized by law to obtain from defendants] is, of course, duly authorized [as well]").

**16.** 42 U.S.C. § 9605 is denominated "National contingency plan." It provides in relevant part:
 Within one hundred and eighty days after the enactment of this Act, the President shall, after notice and opportunity for public comments, revise and republish the national contingency plan for the removal of oil and hazardous substances, originally prepared and published pursuant to section 311 of the Federal Water Pollution Control Act, to reflect and effectuate the responsibilities and powers created by this Act, in addition to those matters specified in section 311(c)(2). Such revision shall include a section of the plan to be known as the national hazardous substance response plan which shall establish procedures and standards for responding to releases of hazardous substances, pollutants and contaminants, which shall include at a minimum:

 (7) means of assuring that remedial action measures are cost-effective over the period of potential exposure to the hazardous substances or contaminated materials....

**17.** *See* George Memorandum at 17 n. 8; and Exhibit D attached to the George Memorandum.

interferes with or prohibits methane recovery it is not cost-effective.

The defendants recognize that this particular challenge to the United States' motion would require review of the merits of EPA's proposed remedy, an exercise that I do not have jurisdiction to perform under CERCLA. *See* § 9613(h) ("No Federal court shall have jurisdiction under Federal law ... to review any challenges to removal or remedial action selected under section 104 [42 U.S.C. § 9604] ...."). However, they maintain that I may—indeed, must—perform the exercise generally prohibited by § 9613(h) because this case falls within the first of the five statutory exceptions to the § 9613(h) prohibition: Federal courts may review challenges to remedial action selected under § 9604 in "[a]n action under section 107 [42 U.S.C. § 9607] to recover response costs or damages or for contribution." § 9613(h)(1). The case allegedly falls within this exception because Count I of the United States' Complaint is a claim to recover costs under § 9607.

■ I hold that § 9613(h) bars me from reviewing EPA's remedial action prior to enforcement. Although the United States brought a claim under § 9607 in its Complaint, that claim is not part of the motion now before me. When Congress included the § 9607 exception to § 9613(h), it did not intend to put federal district courts into the business of performing pre-enforcement, cost-benefit analyses on EPA remediation actions, simply because a § 9607 claim is pleaded somewhere in the Complaint. In fact, § 9613(h)

> is intended to codify the current position of [EPA] and the Department of Justice with respect of pre-enforcement review: there is no right of judicial review of [EPA's] selection and implementation of response action until after the response action[s] have been completed.

H.R.Rep. No. 253, 99th Cong., 1st Sess. 81 (1985), U.S.Code Cong. & Admin.News 1986, p. 2863. *See Dickerson*, 834 F.2d at 977 ("CERCLA precludes preenforcement judicial review of EPA response actions"); *Solid State Circuits, Inc. v. United States Environmental Protection Agency*, 812 F.2d 383, 386 n. 1 (8th Cir.1987) ("The October, 1986, amendments to CERCLA confirm Congress' intent to preclude pre-enforcement review").

The § 9607 cost-recovery claim in the United States' Complaint is wholly independent of the § 9604 claim that provides the basis for the instant motion. The § 9604 claim can stand alone. The fortuity that the two claims have been brought in a single Complaint cannot be used as mechanism by which to undercut Congress's clear intent in the 1986 amendments to CERCLA to preclude pre-enforcement review of EPA remedies, and, thereby, expedite the cleanup of hazardous wastes. *Dickerson*, 834 F.2d at 978 ("'to delay remedial action until the liability situation is unscrambled would be inconsistent with the statutory plan to promptly eliminate the sources of danger to health and environment'").

As Judge Lewis Pollak has recently explained,

> The function of § 9613(h)(1) is to ensure that when EPA decides, as it has decided here, to clean up a hazardous waste site under § 9604 and to seek contribution from PRPs under § 9607 after cleanup has been completed, PRPs may then—but not before—challenge the expense of the cleanup process.... [Plaintiffs'] contentions that EPA has failed to take steps to limit its costs—e.g. by entering into an agreement with the state, or by choosing the cost-effective remedy—are therefore appropriately raised only as defenses against excessive cost recovery under § 9607.

> . . . . .

> PRPs, seeking to limit their liability for hazardous waste cleanup, can be expected to make every effort to diminish the overall clean-up bill before it ultimately comes due. If every cost-reduction suit were heard when it was brought, however, cleanup of hazardous waste sites could be deferred for years while courts attempted to determine who would be responsible for which portion of the cleanup, and to decide what actions should be required of EPA under CERCLA to ensure the least expensive cleanup consistent with environmental standards.

In order to avoid the conflict between the PRPs' interests in inexpensive cleanup and the public's interest in safe and rapid remedies, CERCLA empowers EPA to clean up waste sites itself, and to collect from PRPs after the cleanup has been completed.

*Cabot Corporation v. United States Environmental Protection Agency,* 677 F.Supp. 823, 828 (E.D.Pa.1988) (Pollak, D.J.). The defendants' invocation of § 9613(h)(1) at this point in the current litigation can only be regarded as yet another attempt on their part to obstruct and defer for years the clean-up of the Site, the precise eventuality § 9613(h) was designed to prevent.[18]

### D. *Encroachment on Adjacent Parcels*

■ Defendant Dorothy G. Lacerte, as Trustee of the Hunter Realty Trust ("Hunter Trust") and the 475 Dunstable Road Realty Trust ("Dunstable Trust"), the holders of several parcels adjacent to the Site,[19] has opposed the United States' motion on the additional ground that whatever rights the government may have to enter the Site do not extend to the adjacent parcels. Moreover, Ms. Lacerte asserts that the government has not adequately specified the type of response activity it intends to conduct on the parcel held by the Dunstable Trust, although it has indicated that it intends to treat the Dunstable Trust property as part of the Site itself and not as a mere adjacent parcel.[20]

Ms. Lacerte has not cited any authority for her contention that a more stringent standard applies with respect to the government's right to enter adjacent as opposed to source properties. There appears to be no such authority. The government's rights of entry under § 9604(e) extend to: *"Any ... property where entry is needed* to determine the need for response or the appropriate response or *to effectuate a response action* under [CERCLA]."* Sec. 9604(e)(3)(D) (emphasis supplied).

No distinction is drawn in the statute between adjacent and source properties. If entry upon an "adjacent" property is needed to effectuate an otherwise authorized response activity on a source property, such entry is authorized under § 9604(e). To adopt the distinction between "adjacent" and "source" that Ms. Lacerte would have me draw, would be to run the risk of rendering the statutory right of entry ineffectual. The § 9604(e) right of entry is a right to implement *effective* remedies. If the government could enter source properties, but did not have an equal right of access to certain adjacent properties, there would be numerous instances where its source remedy would be frustrated if not rendered wholly illusory.

Here the government has determined that in order to effectuate the remediation of the Site, it must enter certain adjacent properties held by Ms. Lacerte as Trustee. I find that this determination is reasonable, and that the government's right to enter Ms. Lacerte's adjacent properties is fully authorized under sec. 9604(e)(3). In addition, I find that the government has adequately specified the nature of the response activity it intends to conduct on Ms. Lacerte's "adjacent" properties. If the government's remedy effects a "taking" of the "adjacent" properties held by the Trusts of which Ms. Lacerte is trustee, Ms. Lacerte will have the same rights under the Tucker Act as the owners of the Site. *See supra* at 1271.

### IV.

For the reasons set forth more fully above, I find that my jurisdiction to consider the United States' Motion for an Immediate Order in Aid of Access is proper under 42 U.S.C. § 9604(e)(5). I further find

---

**18.** I observe in passing that even if I were to have jurisdiction to review EPA's proposed remedial action, there is nothing on the present record to suggest that the proposed remedy is arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.

**19.** The Hunter Realty Trust holds parcels marked "A," "B," and "C" on the Camp, Dresser and McKee Plan (attached as Exh. 2 to United States' Memorandum), and the 475 Dunstable Road Realty Trust holds parcel "H" on the Camp–Dresser Plan.

**20.** *See* Camp–Dresser Plan which includes parcel "H," the parcel held by the Dunstable Trust, within the "proposed property line" of the Site.

that: (1) the entry sought in this case is for the purpose of implementing a source-control remedy, a purpose that is authorized under 42 U.S.C. §§ 9604(e) (1) & (3); (2) the initial request for entry to which the defendants denied consent was made by the Regional Counsel's Office of EPA Region I, as authorized by the Administrator of EPA, a properly authorized representative of the President;[21] (3) the Site and the adjacent properties to which entry is sought are places to which entry is authorized under 42 U.S.C. § 9604(e)(3)(A)–(D); (4) EPA has a reasonable basis to believe there may be a release or threat of a release of a hazardous substance or pollutant or contaminant from the Site; and (5) EPA's demand for entry to the Site and certain adjacent properties is not arbitrary or capricious, nor an abuse of discretion, and it is in accordance with law. In addition, I find that I do not have jurisdiction to review the remedy selected by the EPA for the remediation of the Site.

Accordingly, the United States' Motion for an Immediate Order In Aid of Access is ALLOWED.[22] An appropriate ORDER accompanies this Memorandum.

---

21. *See* Exec. Order No. 12580, Sec. 2(g), (i), and (j)(2), 52 Fed.Reg. 2923, 2925 (Jan. 29, 1987). *See also* Affidavit of Paul G. Keough, Deputy Regional Administrator of EPA Region I, and documents attached thereto. (Docket no. 203)

22. The defendants have maintained that if I propose to grant the current motion, then, in addition to the findings set out above, I must also find that the United States would experience "irreparable harm" but for the granting of the motion. This contention is incorrect. It finds no support in any provision of CERCLA or in the case law decided under CERCLA as amended by SARA in 1986.

To be sure, there are pre–SARA cases which provide support for defendants' contention. For instance, in *Outboard Marine Corp. v. Thomas,* 773 F.2d 883, 890 (7th Cir.1985), the court held that § 9604 did not provide EPA with a right to enter the property of others, and that EPA only had a right of entry under § 9606 of CERCLA in emergency situations upon a showing of "imminent and substantial endangerment of the public health or welfare or the environment." The *Outboard Marine* court observed that "[r]egardless of the noble purposes of the EPA, ... [t]he statute is not as ambiguous as it is lacking." *Id.* at 890. Consequently, the Seventh Circuit found that it could not "out of a zeal.to rid our environment of its hazards, rewrite the statute for the EPA. Congress is very capable of doing that." *Id.*

Thereafter, Congress did. In 1986, § 9604(e) was amended to provide EPA with precisely the right of entry denied to them by the court in *Outboard Marine.* Consequently, the Supreme Court vacated the judgment in *Outboard Marine* "in light of the amendment of § 104(e)." *Thomas v. Outboard Marine,* —— U.S. ——, 107 S.Ct. 638, 93 L.Ed.2d 695 (1986).

To the degree a determination of "irreparable harm" is required, however, I find it apparent in this case. The disruption of the competitive bidding process for the cleanup of the Site that would result from a denial of the United States' motion when coupled with further and future delays in adequate remediation clearly constitute irreparable harm.