**CABOT CORPORATION, Firestone Tire and Rubber Co., Inc., Merck, Sharp & Dhome Division of Merck & Co., Inc., Richardson–Vicks, Inc., Superior Tube Company, Synthane–Taylor, Division of Alco Industries, Inc., Union Carbide Corporation, and W.R. Grace & Company**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Lee Thomas, E.P.A. Administrator and James M. Seif, Regional Administrator, E.P.A. Region III.**

Civ. A. No. 87–4431.

United States District Court,
E.D. Pennsylvania.

Jan. 13, 1988.

Susan LeGros, Montgomery, McCracken, Walker & Rhoads, Philadelphia, and Frank M. Thomas, Jr., Morgan Lewis & Bockius, Philadelphia, for plaintiffs Cabot, Richardson–Vicks and Synthane–Taylor.

Sheila D. Jones, David Thomson, U.S. Dept. of Justice, Land & Natural Resources Division, Environmental Enforcement Section, Washington, D.C., Margaret Hutchinson, Asst. U.S. Atty., Philadelphia, Lois W. Davis, for U.S. Environmental Protection Agency, Lee M. Thomas and James M. Seif.

OPINION

LOUIS H. POLLAK, District Judge.

A group of companies alleged to be transporters and generators of the waste deposited at Moyer's Landfill—designated potentially responsible parties (PRPs) under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA)—filed the complaint in this case against the Environmental Protection Agency (EPA).[1] They claim that in the course of its initial efforts toward cleaning up Moyer's Landfill, EPA has failed to fulfill its non-discretionary duties under CERCLA and the National Oil and Hazardous Substances Pollution Contingency Plan (NCP).

In addressing their complaint to EPA, the PRPs apparently assumed that EPA had exclusive authority over Moyer's Landfill under, and subject to the conditions imposed by, CERCLA. As described in the Opinion in the *O'Leary v. Moyer's Landfill* case filed simultaneously with this Opinion, the court-appointed Receiver and, subsequently, the EPA each initiated a cleanup at the Moyer's Landfill site. These independent and not entirely consistent cleanup efforts gave rise to a dispute as to whether the Receiver, under this court's Consent Decree, or EPA, under CERCLA, has authority to clean up the hazardous waste at Moyer's Landfill. The accompanying Opinion describes my disposition of that dispute. In view of my decision to permit EPA to clean up Moyer's Landfill,[2] the statutory and regulatory requirements of CERCLA and the NCP do provide the relevant framework for the cleanup.

EPA began to plan and to implement its cleanup at Moyer's Landfill in September, 1983, after this court had approved a remedial plan to be implemented by the Receiver appointed by the court. Under CERCLA and the NCP, EPA is required to conduct a

---

1. This case is related to *O'Leary v. Moyer's Landfill,* Civil Action No. 80–3849 (E.D.Pa. filed Oct. 3, 1980). The background statement set forth in the Opinion in that case, filed simultaneously with this opinion, 677 F.Supp. 807, also provides background for these motions.

2. That permission was granted subject to certain conditions as outlined in the opinion in *O'Leary v. Moyer's Landfill,* but those conditions are not pertinent here.

Remedial Investigation/Feasibility Study (RI/FS) in order to investigate and select the appropriate remedy for any hazardous waste site it proposes to clean up. The NCP requires that the public be invited to participate in the RI/FS process.

When EPA undertook to conduct its own cleanup at Moyer's Landfill, it accepted the Receiver's cleanup plan as a proposal submitted to it pursuant to the required solicitation of public participation. EPA also notified several potentially responsible parties, including the plaintiffs in this case, that it had begun to investigate remedial options for the landfill. The PRPs responded by forming a PRP Committee to negotiate with EPA. Extensive negotiations ensued between EPA, the Pennsylvania Department of Environmental Resources (DER), the Receiver, the PRPs, and the plaintiffs in the original *O'Leary* suit.

While negotiations were taking place, EPA took further steps to plan its own cleanup of the landfill, should no settlement be reached: EPA's cleanup would be conducted by the Agency pursuant to 42 U.S.C. § 9604, and funded eventually by responsible parties, from which EPA would recover pursuant to 42 U.S.C. § 9607. In September of 1985, EPA issued a Record of Decision (ROD), evaluating several alternative cleanup plans for the landfill, including a plan denominated the Receiver's Alternative. EPA then issued a revised version of its RI/FS, dated January 22, 1986.

In November, 1985, the PRPs submitted an additional cleanup plan to EPA, which became the focus of the continuing negotiations between the parties. While negotiations were ostensibly being finalized, the PRPs petitioned EPA on December 15, 1986, for modification of the ROD to adopt the PRPs' plan as "the cost-effective response in accordance with the requirements of 42 U.S.C. § 9604(c)(4)." *See* Exhibit K to Plaintiffs' Motion. By letter dated December 17, 1986, EPA expressed its intention to reject the PRPs' petition for modification of the ROD. *See* Exhibit L to Plaintiffs' Motion. EPA took the position that, notwithstanding EPA's participation in settlement discussions premised on the accept-

ability under CERCLA of the PRPs' plan, EPA was under no obligation to modify the ROD to adopt the PRPs' plan. In July of 1987, shortly after it became clear to the participants that the negotiation process had irreparably broken down, the PRPs initiated this lawsuit.

In their complaint, the PRPs challenge EPA for failing to take certain steps to limit the cost of the cleanup it has chosen to undertake, including failing to share costs with the Commonwealth of Pennsylvania, and failing to adopt the PRPs' plan, which they contend would be less expensive than, but as effective as, the plan EPA has selected. Specifically, the PRPs allege that EPA violated CERCLA by failing to: 1) enter into a contract or cooperative agreement with the Commonwealth as required by 42 U.S.C. § 9604(c)(3) and 40 C.F.R. § 300.68(b)(2); 2) select the most cost-effective alternative from among the available remedial plans as required by 42 U.S.C. § 9621(a), (b) and 40 C.F.R. § 300.68(i) and (j); 3) modify the Record of Decision (ROD), dated September 30, 1985, to include detailed cost data on all the environmentally acceptable remedial alternatives, including the PRPs' plan, as required by 42 U.S.C. § 9621(a), or to give written reasons for denying the PRPs' motion for modification of the ROD; and 4) notify the PRPs and consider their comments and their proposed remedial alternative when revising the RI/FS, as required by 42 U.S.C. § 9621(a) and 40 C.F.R. §§ 300.67(d), and 300.68. The PRPs seek to enjoin EPA from taking remedial action until it enters into a contract or cooperative agreement with the Commonwealth, evaluates each plan, including the PRPs' alternative, for cost-effectiveness, and seeks public review and comment on its determination.

The PRPs moved for summary judgment on August 14, 1987 on all counts. In response, EPA asserted the absence of subject-matter jurisdiction under 42 U.S.C. § 9659 (relating to citizen suits) as that provision is limited by 42 U.S.C. § 9613(h) (relating to timing of judicial review). EPA also opposed the PRPs' motion on its

merits.[3] EPA subsequently filed a motion to dismiss or in the alternative for summary judgment, focusing exclusively on its argument that this court is without jurisdiction—i.e., that the suit is premature.

For the reasons set forth below, I conclude that EPA's contention that this court does not currently have jurisdiction to entertain the claims of the PRPs is soundly based. For that reason, EPA's motion to dismiss will be granted, and the PRPs' motion for summary judgment will be denied.

### Discussion

■ The PRPs filed their complaint under the citizen-suit provisions of CERCLA added by the Superfund Amendments and Reauthorization Act of 1986 (SARA). 42 U.S.C. § 9659. Subsection 9659(a)(2) of SARA grants any person the authority to bring a civil action against EPA for any violation of CERCLA or for failure to perform non-discretionary duties under CERCLA. 42 U.S.C. § 9659(a)(2) reads as follows:

*Authority to bring civil actions*

Except as provided in subsections (d) and (e) of this section and in section 9613(h) of this title (relating to timing of judicial review), any person may commence a civil action on his own behalf—

(1) against any person (including the United States and any other governmental instrumentality or agency, to the ex-

tent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter (including any provision of an agreement under section 9620 of this title, relating to Federal facilities); or

(2) against the President or any other officer of the United States (including the Administrator of the Environmental Protection Agency and the Administrator of the ATSDR) where there is alleged a failure of the President or of such other officer to perform any act or duty under this chapter, including an act or duty under section 9620 of this title (relating to Federal facilities), which is not discretionary with the President or such other officer.

Paragraph (2) shall not apply to any act or duty under the provisions of section 9660 of this title (relating to research, development and demonstration).

The PRPs contend that the citizen-suit provision confers jurisdiction on this court to hear their claims that EPA has violated its duties under CERCLA and the National Contingency Plan (NCP).

The citizen-suit provision is on its face limited by subsection 9613(h), however, which delays judicial review of most "challenges to removal or remedial actions selected under section 9604" of CERCLA.[4]

---

**3.** On the merits, EPA contends that it had enough information about the Receiver's Alternative to evaluate it thoroughly in comparison with several plans devised by EPA, and that it did so prior to the issuance of the ROD and original RI/FS. It characterizes the Agency's subsequent interaction with the PRPs about their cleanup plan as part of the process of settlement discussions, and therefore not subject to the CERCLA or NCP provisions governing analysis and selection of remedial options. Because, in EPA's view, the process of remedial selection terminated when the ROD was issued, and was not reopened by the issuance of the second RI/FS (which EPA views as a final draft of the original one) EPA contends that no notice and comment was required when the second RI/FS was issued. EPA takes the position that the PRPs wrongly invoke the NCP requirement that EPA enter into a cooperative agreement or contract with the Commonwealth on the ground that the requirement does not apply to the plan-

ning activities that EPA has thus far undertaken. A cost-sharing agreement with the state would only be required, EPA contends, if the site had been owned by the Commonwealth when hazardous waste was deposited there.

**4.** Section 9613(h) provides for a general ban on judicial review of EPA actions under CERCLA, and then carves five specific exceptions out of that ban, as follows:

*Timing of review*

No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this t itle, or to review any order issued under section 9606(a) of this title, in any action except one of the following:

The PRPs' suit is covered by § 9613(h), because it challenges EPA's cleanup activities which thus far have been conducted pursuant to § 9604. The PRPs contend that the § 9613(h) limitations do not apply to their suit because they "are not asking this Court to substitute one specific remedial alternative for another," i.e. are not bringing a challenge to removal or remedial action such as is referred to in § 9613(h), but merely seek "a remand to EPA so that EPA can itself make a lawful selection of a remedy." Plaintiffs' Memorandum of Law in Opposition to United States' Motion to Dismiss, at 3–4. The statute does not, however, support any such distinction between a challenge to removal or remedial action and the PRPs' suit.

Removal actions include "such actions as may be necessary to monitor, assess and evaluate the release or threatened release of hazardous substances." 42 U.S.C. § 9601(23). The RI/FS process challenged by plaintiffs appears to be the type of planning activity statutorily designated as removal action. Remedial action includes "those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24). Each of EPA's alleged actions or omissions that the PRPs challenge as violative of EPA's duties under CERCLA and the NCP can be characterized as a necessary component of action taken "consistent with permanent remedy" of the waste problem at Moyer's Landfill, and therefore falls within the statute's broad definition of remedial action.

(1) An action under section 9607 of this title to recover response costs or damages or for contribution.
(2) An action to enforce an order issued under section 9606(a) of this title or to recover a penalty for violation of such order.
(3) An action for reimbursement under section 9606(b)(2) of this title.
(4) An action under section 9659 of this title (relating to citizens suits) alleging that the re-

The legislative history of § 9613(h) supports my conclusion that the PRPs' suit is covered by that provision. In debate on the 1986 amendments, several legislators emphasized that the timing-of-review provisions should be read broadly to preclude review of any action under CERCLA until the time at which review is specifically permitted under the appropriate subsection of § 9613(h). In Senator Thurmond's words, "[t]he timing of review section is intended to be comprehensive.... [It] covers all issues that could be construed as a challenge to the response, and limits those challenges to the opportunities specifically set forth in the section." 132 Cong.Rec. S14929 (daily ed. Oct. 3, 1986). Representative Glickman expressed the same understanding when he stated that "[t]he only opportunity for review that is not specifically provided for in the timing of review provision is the opportunity set forth in new section 121(f)(2) and (3), the cleanup standards section relating to remedial actions secured under section 106 [42 U.S.C. § 9606] and remedial actions at facilities owned or operated by a Federal agency.... This opportunity does not exist for fund-financed remedial action." 132 Cong. Rec. H9582 (daily ed. Oct. 8, 1986).

Both EPA and the PRPs assume that if any provision of § 9613(h) applied to this action, it would be subsection (4), which establishes the timing of review of citizen suits. The PRPs refer to their action as a citizen suit, and assert that jurisdiction is based on 42 U.S.C. § 9659. EPA accepts that characterization, but contends that subsection 9613(h)(4) defers review of EPA's response actions until the cleanup is completed. The PRPs, in contrast, read subsection (4) as allowing immediate review of their particular claims.

moval or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.
(5) An action under section 9606 of this title in which the United States has moved to compel a remedial action.

Among the five subsections of § 9613(h), subsection 9613(h)(4) appears to be the provision most hospitable to early judicial review. It allows courts to entertain any citizen's challenge alleging that "the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of this chapter." This language arguably permits challenges to EPA's plans even before they have been implemented. *See, e.g.,* 132 Cong.Rec. H9575 (daily ed. Oct. 8, 1986) (remarks of Rep. Florio, stating that "[a] final cleanup decision, or plan, constitutes the taking of action at a site, and the legislative language makes it clear that citizens' suits under section 310 [42 U.S.C. § 9659] will lie alleging violations of law and irreparable injury to health as soon as—and these words are a direct quote— 'action is taken.' "); 132 Cong.Rec. S14898 (daily ed. Oct. 3, 1986) (remarks of Sen. Stafford, stating that "[i]t is crucial, if it is at all possible, to maintain citizens' rights to challenge response actions, or final cleanup plans before such plans are implemented even in part....")

Subsection 9613(h)(1), however, also appears to apply to this case. That provision authorizes judicial review of EPA actions or orders when EPA acts under § 9607 "to recover response costs or damages for contribution." The function of § 9613(h)(1) is to ensure that when EPA decides, as it has decided here, to clean up a hazardous waste site under § 9604 and to seek contribution from PRPs under § 9607 after cleanup has been completed, PRPs may then—but not before—challenge the expense of the cleanup process. In cost-recovery actions, PRPs may only be found liable for "costs not inconsistent with the national contingency plan." § 9607(a)(4)(A)–(B). PRPs' contentions that EPA has failed to take steps to limit its costs—e.g. by entering into an agreement with the state, or by choosing the cost-effective remedy—are therefore appropriately raised only as defenses against excessive cost recovery under § 9607. *Cf. Lone Pine Steering Committee v. United*

*States E.P.A.,* 777 F.2d 882, 887 (3d Cir. 1985).

■ The parties' assumption that, if any timing-of-review provision applies, § 9613(h)(4) is the appropriate one, does not adequately take into account the overall structure of the timing-of-review provisions. If the PRPs here, in the guise of citizens, were permitted to raise the same challenges in a citizen suit timed in accordance with § 9613(h)(4) that they, as PRPs, would have had to wait to raise under § 9613(h)(1), subsection (4) would eviscerate subsection (1). In order to avoid reading §§ 9659 and 9613(h)(4) as permitting an "end-run" around the ban on preenforcement review that would otherwise apply here, § 9613(h)(4) must be read as applying only to those claims that would not otherwise be deferred under § 9613(h)(1), (2), (3) or (5).

This interpretation of the timing-of-review provisions is supported by the logic behind those provisions, and is borne out by their legislative history. Pre-enforcement adjudication of many PRPs' actions is inconsistent with the prompt cleanup required to prevent irreparable harm to public health and the environment. PRPs, seeking to limit their liability for hazardous waste cleanup, can be expected to make every effort to diminish the overall cleanup bill before it ultimately comes due. If every cost-reduction suit were heard when it was brought, however, cleanup of hazardous waste sites could be deferred for years while courts attempted to determine who would be responsible for which portion of the cleanup, and to decide what actions should be required of EPA under CERCLA to ensure the least expensive cleanup consistent with environmental standards. In order to avoid the conflict between the PRPs' interests in inexpensive cleanup and the public's interest in safe and rapid remedies, CERCLA empowers EPA to clean up waste sites itself, and to collect from PRPs after the cleanup has been completed. *See Lone Pine,* 777 F.2d 882.[5] Due process

5. Since the Third Circuit decided *Lone Pine* in 1986, Congress amended CERCLA to add the

timing-of-review provisions. *Lone Pine* nonetheless remains relevant insofar as it explains

rights of PRPs are protected by PRPs' eventual opportunity to contest unnecessary costs that EPA attempts to recover from them.[6] The expectation that it will have to defend against such claims by PRPs gives EPA an incentive to conduct cleanups in accordance with CERCLA and the NCP.

■ The need to ensure that the citizen-suit provision not provide an opportunity for potentially responsible parties to avoid the statutory prohibition on pre-enforcement review of EPA's § 9604 cleanups was of concern to Congress in amending CERC-LA. In this regard, some legislators emphasized the distinction between suits focusing on health or environmental concerns and suits alleging monetary harm. The example of a typical citizen suit that legislators frequently adverted to during debate over SARA was a suit alleging "that the President or other officials have violated the cleanup standards or other requirements of the law and that public health or the environment would be threatened if the proposed action were undertaken or continued." 132 Cong.Rec. S14898 (daily ed. Oct. 3, 1986) (remarks of Sen. Stafford). *See* 132 Cong.Rec. H9575 (daily ed. Oct. 8, 1986) (similar remarks of Rep. Florio); *id.* at H9600 (similar remarks of Rep. Roe).

Although PRPs are not in terms barred from bringing citizen suits, Congress' decision to enable EPA to clean up hazardous waste sites prior to litigating the allocation of the expenses of those cleanups supports a distinction between citizen suits alleging irreparable harms and those claiming monetary damages. Health and environmental hazards must be addressed as promptly as possible rather than awaiting the completion of an inadequately protective response action. Irreparable harms are precisely those that one would expect "typical" concerned citizens—neighboring residents of hazardous waste sites—to raise in a lawsuit under CERCLA.[7] The statutory language empowers any person to bring a citizen suit, irrespective of whether that person is also a PRP; if PRPs were to allege that EPA's chosen response action posed a risk of irreparable harm to health or the environment, review of their claims should be timed as permitted by § 9613(h)(4). But where PRPs allege harms the implications of which are essentially monetary, those allegations should be tested when EPA seeks to collect cleanup costs, as provided by § 9613(h)(1). Subsection 9613(h)(4) should not be applied in such a way as to undermine subsection 9613(h)(1). Because the plaintiffs' suit alleges EPA's failures in a variety of ways to

the cleanup strategy that remains available to EPA under §§ 9604 and 9607, and suggests that the issue of timing of review should be decided in light of that strategy.

6. Of course, such an opportunity provides due process only where the PRPs' suit alleges compensable rather than irreparable injury. The compatibility with due process of deferring judicial review of claims of compensable harm, as distinguished from the need for prompt review of allegations of irreparable injury, such as harm to public health or the environment, supports the distinction here drawn between PRPs' suits alleging essentially monetary harms and bona fide citizen suits alleging irreparable harm.

7. Several members of Congress viewed it as the responsibility of the courts to ensure that only such bona fide citizen suits be allowed to proceed. As Representative Roe explained, "[t]he legislation intends that the courts will draw appropriate distinctions between dilatory lawsuits by potentially responsible parties involving only monetary damages and legitimate citizen

suits representing irreparable injury that can only be addressed during the course of implementing a cleanup." *Id.* In a similar vein, Senator Mitchell stated that

[i]n considering whether citizens' suits should lie for cleanup, it is important to consider the equities of the situation. Citizens are suing to compel compliance with cleanup standards that are designed to protect the public health. Responsible parties, on the other hand, may be suing to halt cleanup because of concerns that the response action is too costly.

. . . . . .

[C]ourts should carefully weigh the equities and give great weight to the public health risks involved.

132 Cong.Rec. S. 14818, Oct. 3, 1986. Senator Stafford, too, urged courts to "draw appropriate distinctions between dilatory or other unauthorized lawsuits by potentially responsible parties involving only monetary damages and legitimate citizen suits complaining of irreparable injury that can only be addressed only [sic] if a claim is heard during or prior to a response action." *Id.* at 14898.

limit the costs of the cleanup at Moyer's Landfill, it must be postponed as required by § 9613(h)(1) until such time as EPA may sue for contributions from them.

An appropriate order accompanies this memorandum.

### ORDER

For the reasons stated in the accompanying memorandum, this court does not now have jurisdiction to consider plaintiffs' claims. It is accordingly hereby ORDERED AND DIRECTED that plaintiffs' motion for summary judgment is DENIED, defendants' motion to dismiss is GRANTED, and the complaint is DISMISSED.