The B.F. GOODRICH COMPANY, et al.

v.

Harold MURTHA, et al.

UNIROYAL CHEMICAL COMPANY, INC.

v.

Harold MURTHA, et al.

UNITED STATES of America

v.

Harold MURTHA, et al.

STATE OF CONNECTICUT

v.

Harold MURTHA, et al.

Civ. Nos. N–87–52 (PCD), N–87–67 (PCD), N–87–74 (PCD) and N–87–73 (PCD).

United States District Court, D. Connecticut.

Oct. 24, 1988.

Barbara A. Finamore, William D. Brighton, Trial Atty., Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Philip R. Boxell, Gregory M. Keenan, Office of Regional Counsel, U.S.

E.P.A., Region I, Boston, Mass., Frank H. Santoro, Asst. U.S. Atty., New Haven, Conn., for plaintiff U.S.

Louis R. Pepe, David E. Rosengren, Michael A. Zizka, Pepe & Hazard, Hartford, Conn., John R. Cromer, Mishkin, Cromer, Eagelsfield & Maher, P.C., Indianapolis, Ind., for plaintiffs B.F. Goodrich, et al.

William R. Murphy, Stanley E. Parese, Tyler, Cooper & Alcorn, New Haven, Conn., Deming E. Sherman, Judith Coleback Savage, Edwards & Angell, Providence, R.I., for plaintiff Uniroyal.

Kenneth Tedford, Asst. Atty. Gen., Hartford, Conn., for plaintiff State of Conn.

Laura B. Frankel, Mark J. Zimmerman, Thomas J. Shortell, Elizabeth C. Barton, Updike, Kelly & Spellacy, P.C., Hartford, Conn., for defendants and third-party plaintiffs Harold Murtha, et al.

## RULING ON MOTION FOR ORDER IN AID OF ACCESS AND FOR PRELIMINARY INJUNCTION

DORSEY, District Judge.

In this consolidated action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, the Environmental Protection Agency ("EPA") seeks an order granting it access to a landfill site owned by defendants Harold Murtha ("Murtha") and Beacon Heights, Inc. ("Beacon"). EPA also seeks an injunction to require defendants to permit certain third parties, who have entered into a con-

sent decree with EPA, to enter the landfill and conduct long-term response activities within EPA's jurisdiction and under EPA supervision.

### I. *Facts and Procedural History*

In 1983, the Beacon Heights Landfill Site (the "Site") was listed by EPA on the National Priority List of hazardous waste sites for priority cleanup under CERCLA. *See* 40 C.F.R. Part 300, App. B (site 220) (1987). The Site consists of a closed commercial landfill comprising about 36 acres and certain adjacent property in Beacon Falls, Connecticut.[1] Defendant Beacon is the record owner of and formerly operated the landfill within the Site; defendant Murtha is president and sole shareholder of Beacon. Plaintiff in Civil No. N–87–74, the United States Environmental Protection Agency, is party to a consent decree in which 32 corporations, each alleged to have generated hazardous wastes found at the Site (the "settling generators"), agreed to implement under EPA supervision a Remedial Action Plan ("RAP") developed for the Site.[2] *United States v. B.F. Goodrich Co.*, Civil No. N–87–286 (D.Conn. Sept. 15, 1987) (Consent Decree); *see also* Novak Affidavit, Exhibit D (EPA ROD of Sept. 23, 1985, specifying long-term remedy for Site). Several of the settling generators are plaintiffs in Civil No. N–87–52 and Civil No. N–87–67.

EPA seeks, for the agency, the settling generators, their agents, employees and contractors, full and unrestricted access to

---

**1.** A map of the Site is contained in the NUS Remedial Investigation Report at 1–2 (April 1985) ("RIR") attached as Exhibit A to the Affidavit of Karl W. Novak. The RIR was prepared as part of EPA's effort to evaluate and study potential responses to hazards at the Site. The Site was used for waste disposal for 60 years from the 1920's until 1979. EPA estimates that during 1970–1979, defendants' primary period of operation of the landfill, 107,500 tons of solid and 46 tons of liquid waste were disposed at the Site annually, including oils, chemical liquids and sludges, solvents, and rubber. RIR at 1–6. EPA's Remedial Investigation determined that numerous contaminants are present in the soil, ground water, and leachate at the Site, including benzene, chlorobenzene, and bis (2–chloroethyl) ether. RIR at 4–55 to 61; 4–25 to 4–33. These substances, and others found at the Site,

have been designated "hazardous substances" under § 9601(14). *See* 40 C.F.R. Part 302, Table 302.4 (1987).

**2.** EPA's Record of Decision ("ROD") determined that the long-term remedy for the Site should include extension of the public water supply to homes whose wells are threatened by contamination from the Site; installing an impermeable cap over the Site; constructing a system for collection and treatment of leachate; and installing a ground water monitoring system. Novak Affidavit, Exhibit D. The parties to the consent decree agreed upon a detailed RAP intended to effectuate the ROD. *See* Consent Decree, App. A. The projected cost of this remedy was approximately $19.6 million in 1985. Novak Affidavit, ¶ 12.

the Site to conduct response activities at the Site to implement the consent decree. In addition, EPA seeks a preliminary injunction directing defendants to permit such access and to refrain from interfering with the response activities.

## II. *Discussion*

### A. EPA Access

Section 9604(e)(3),[3] 42 U.S.C., authorizes EPA to enter "any vessel, facility, establishment or other place or property where entry is needed to determine the need for response or to effectuate a response action under this subchapter." This power of entry may be exercised "only if there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant. The authority ... may be exercised only for the purposes of determining the need for response, or choosing or taking any response action under this subchapter, or otherwise enforcing the provisions of this subchapter." 42 U.S.C. § 9604(e)(1).[4] Should the owner of property to which EPA requests entry deny consent, EPA may, pursuant to § 9604(e)(5), seek either an administrative order of access or a court order to compel compliance.[5] *United States v. Charles George Trucking Co.*, 682 F.Supp. 1260, 1264–65 (D.Mass.1988).

3. Section 9604(e)(3) provides:
   Any officer, employee, or representative describe in paragraph (1) is authorized to enter at reasonable times any of the following:
   (A) Any vessel, facility, establishment, or other place or property where any hazardous substance or pollutant or contaminant may be or has been generated, stored, treated, disposed of, or transported from.
   (B) Any vessel, facility, establishment, or other place or property from which or to which a hazardous substance or pollutant or contaminant has been or may have been released.
   (C) Any vessel, facility, establishment, or other place or property where such release is or may be threatened.
   (D) Any vessel, facility, establishment, or other place or property where entry is needed to determine the need for response or the appropriate response or to effectuate a response action under this subchapter.
   "[R]esponse action" is expansively defined by § 9601(23)–(25) to include both temporary cleanup or "removal" of hazardous substances and actions consistent with permanent "remedy."

4. Section 9604(e)(1) provides:
   Any officer, employee, or representative of the President, duly designated by the President, is authorized to take action under paragraph (2), (3), or (4) (or any combination thereof) at a vessel, facility, establishment, place, property, or location or, in the case of paragraph (3) or (4), at any vessel, facility, establishment, place, property, or location which is adjacent to the vessel, facility, establishment, place, property, or location referred to in such paragraph (3) or (4). Any duly designated officer, employee, or representative of a State or political subdivision under a contract or cooperative agreement under subsection (d)(1) of this section is also authorized to take such action. The authority of paragraphs (3) and (4) may be exercised only if there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant. The authority of this subsection may be exercised only for the purposes of determining the need for response, or choosing or taking any response action under this subchapter, or otherwise enforcing the provisions of this subchapter.

5. Section 9604(e)(5) provides:
   (A) Issuance
   If consent is not granted regarding any request made by an officer, employee, or representative under paragraph (2), (3), or (4), the President may issue an order directing compliance with the request. The order may be issued after such notice and opportunity for consultation as is reasonably appropriate under the circumstances.
   (B) Compliance
   The President may ask the Attorney General to commence a civil action to compel compliance with a request or order referred to in subparagraph (A). Where there is a reasonable basis to believe there may be a release or threat of a release of a hazardous substance or pollutant or contaminant, the court shall take the following actions:
   (i) In the case of interference with entry or inspection, the court shall enjoin such interference or direct compliance with orders to prohibit interference with entry or inspection unless under the circumstances of the case the demand for entry or inspection is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.
   (ii) In the case of information or document requests or orders, the court shall enjoin interference with such information or document requests or orders or direct compliance with the requests or orders to provide such information or documents unless under the circumstances of the case the demand for information or documents is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

EPA has requested access to the Site and defendants have refused. Defendants concede that the statutory "reasonable basis" exists and that the statute authorizes access for EPA itself, its employees and agents. Thus, they do not oppose the motion for access insofar as it is based on § 9604(e) and seeks access for EPA only.[6]

Accordingly, the motion for access is granted as to EPA, its employees and agents.

B. *Access for the Settling Generators*

■ While EPA has undisputed authority pursuant to § 9604(e)(1) to enter the Site itself and commence response activities immediately, the agency has chosen another course of action by entering into the consent decree. The terms of this decree obligate the settling generators to implement the remedy chosen by EPA for the Site. However, the generators have been refused Site access by defendants. The agency moves to compel defendants to permit the settling generators entry to the Site for the purpose of effectuating the RAP. While EPA acknowledges that § 9604(e) does not expressly authorize an order requiring a landowner to permit private parties to enter a hazardous waste disposal site, the agency contends that such an order may be based on § 9606(a) and this court's equitable powers. Whether § 9606(a) provides such authority, as well as the circumstances under which it might be applied, appear to be questions of first impression.

Section 9606(a) provides:

Abatement actions.

(a) Maintenance, jurisdiction, etc.

In addition to any other action taken by a State or Local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

1. *§ 9606(a) as an "Access" Provision*

Defendants' first contention is that an order for access by private parties cannot be based upon § 9606(a) because § 9604(e) is the exclusive provision for access to hazardous waste facilities under CERCLA. In EPA's view, the injuction it seeks is "necessary to abate [the] threat" of release of hazardous substances from the Site. That necessity is not contested.

Section 9604(e) explicitly provides for access to waste facilities and § 9604(e)(1) authorizes such access for "any officer, employee, or representative of the President, duly designated by the President." Defendants would read these provisions as precluding the invocation of § 9606(a) to authorize access for private parties. How-

---

The court may assess a civil penalty not to exceed $25,000 for each day of noncompliance against any person who unreasonably fails to comply with the provisions of paragraph (2), (3), or (4) or an order issued pursuant to subparagraph (A) of this paragraph.

6. In June 1987, EPA sought and obtained an *ex parte* warrant authorizing EPA, the State of Connecticut, and the settling generators access to the Site for the purpose of testing and analysis. Defendants subsequently moved to quash the warrant and sought to condition any access on the execution of liability releases by persons

coming onto the property. The magistrate denied the motion to quash and rejected the proposed condition on access. *United States v. Murtha*, Civil Nos. N–87–52, N–87–74 (D.Conn. July 1, 1987), Ruling on Motion to Quash. Defendants have renewed their request for the imposition of conditions on access. However, as the magistrate recognized, the express language of § 9604(e) places no such condition on EPA's access to hazardous waste sites, nor can one be judicially constructed. *See Id.,* Ruling on Motion to Quash at 3–4; *Charles George Trucking Co.,* 682 F.Supp. at 1265.

94

ever, there are compelling reasons not to read § 9606(a) in so limited a fashion. There is no compelling reason to read it as would defendants.

Section 9606(a) is broadly worded to authorize all relief "necessary to abate [the] danger or threat." There is no express restriction on the nature of the relief authorized except as equity and the public interest may require. Under § 9606(a), defendants could be ordered to effectuate a remedial plan for the Site. Alternatively, EPA could have chosen to perform the cleanup itself under § 9604(e) and sought reimbursement from defendants for response costs under § 9607. *See Charles George Trucking Co.*, 682 F.Supp. at 1272, 1274 (EPA granted entry under § 9604(e) to effect remedy). In either case, defendants would not be heard to contest the remedial action on their property, irrespective of their claims that they are not responsible for the costs of such action. *See Id.* at 1272–73 (remedial action under § 9604 must precede assessment of liability and cost-recovery under § 9607); *see also* Dickerson v. EPA, 834 F.2d 974, 978 (11th Cir.1987); Cabot Corp. v. EPA, 677 F.Supp. 823, 828 (E.D.Pa.1988). In view of the alternatives provided by CERCLA, the language of § 9606(a) is easily broad enough to authorize the court to enjoin defendants from interfering with private parties effectuating an EPA-approved remedy. EPA is authorized to remedy the situation. Nothing in the Act restricts EPA's choice of parties by which to do so.

Defendants' argument that the broad language of § 9606(a) is impliedly limited by § 9604(e) is rejected. The two provisions are not co-extensive: § 9606(a) is invocable only upon a showing of imminent and substantial endangerment, a stricter standard than the "reasonable basis" required for EPA access under § 9604(a)(1). Moreover, defendants' construction is inconsistent with the purposes of CERCLA. The twin goals of CERCLA have been aptly summarized:

First, Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to problems of national magnitude resulting from hazardous waste disposal. Second, Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibilities for remedying the harmful conditions they created.

*United States v. Reilly Tar & Chem. Corp.*, 546 F.Supp. 1100, 1112 (D.Minn. 1982). Permitting EPA to invoke § 9606(a) to obtain Site access for the settling generators and to effectuate the decree serves both of those statutory purposes.

Using CERCLA, EPA has succeeded in obtaining a consent decree under which a large number of responsible parties have agreed to effectuate an immediate remedy. In 1986, CERCLA was amended expressly to authorize EPA to enter into such settlements with some or all potentially responsible individuals. 42 U.S.C. § 9622 [1988 Supp.] (as added by P.L. 99–499, Title I. § 122(a), effective Oct. 19, 1986). Section 9622(c)(2) provides that, if a consent decree is entered into, "the President may take any action under § 9606 of this title *against any person who is not a party to the agreement.*" *Id.*, § 9622(c)(2) (emphasis added). Non-participating persons are expressly prohibited from taking any remedial action at the facility involved without the prior consent of the EPA. *See* § 9622(e)(6). Obviously, Congress did not intend the owner of a facility to have veto power over necessary remedial work at a pollution site, nor to be able to halt the remedial process merely because the owner-in-possession did not join in a settlement with EPA. Rather, Congress intended EPA to have all options as to methods by which to effectuate response action as quickly as possible and, where possible, to persuade potentially responsible persons to perform response actions voluntarily. It was no doubt anticipated that some settlements would not include the owners of a facility and thus § 9622 not only prohibits interference with remedial action under a consent decree, but leaves the avenue open for EPA to seek further relief under § 9606(a). § 9622(e)(6), § 9622(c)(2). Logic dictates that such relief may, in appropri-

ate circumstances, include an order that the owners of a facility permit parties to a consent decree access to effectuate a remedy at the Site.[7]

### 2. *Imminent and Substantial Endangerment*

■ Defendants argue that, even if § 9606(a) authorizes the injunction sought, the "imminent and substantial endangerment" standard permits such an order only in emergency situations and that no such situation exists here. EPA argues that reference to "the public interest and the equities of the case" requires the application to this motion of the equitable standard for a preliminary injunction, *see, e.g., Procter & Gamble Co. v. Cheesebrough Pond's, Inc.,* 747 F.2d 114, 118 (2d Cir. 1984), modified by the "imminent and substantial endangerment" test contained within the statute itself. Thus, the test proposed would permit an order of access upon a showing of

(1) imminent and substantial endangerment to the public health, welfare, or the environment from the actual or threatened release of a hazardous substance from a facility; and

(2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor.

*Compare Id.* at 118 (classic preliminary injunction standard); *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979) (same) *with United States v. Conservation Chem. Co.,* 619 F.Supp. 162, 192–93 (W.D.Mo.1985) (injunctive relief under § 9606(a) available on lesser showing than traditional irreparable harm standard); *United States v. Price,* 688 F.2d 204, 211, 213–14 (3d Cir.1982) (construing "imminent and substantial endangerment" language in § 7003 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6973). Under § 9606(a), an injunction may be granted when there is but a risk of harm, rather than on the more stringent showing of threatened irreparable harm. *Conservation Chem. Co.,* 619 F.Supp. at 193; *see Price,* 688 F.2d at 211.

A few courts have, in dicta, referred to § 9606(a) as an "emergency" provision. *See, e.g., Outboard Marine Corp. v. Thomas,* 773 F.2d 883, 890 (7th Cir.1985), *vacated and remanded in light of amendment of § 9604,* 479 U.S. 1002, 107 S.Ct. 638, 93 L.Ed.2d 695 (1986); *United States v. Wade,* 546 F.Supp. 785, 794 (E.D.Pa.1982), *appeal dismissed,* 713 F.2d 49 (3d Cir.1983). However, in construing § 9606(a), neither *Outboard Marine Corp.* nor *Wade* addressed the issues presented here. *Wade* held that § 9606(a) does not impose liability for response costs on past off-site generators of hazardous wastes because §§ 9604 and 9607 provide an express mechanism for imposing such liability. *Id.* at 793–94. The court suggested that § 9606 was intended to be used "in emergency situations where hazardous waste was currently being discharged or threatened to be discharged 'from a facility' and where such discharge would be stopped by an injunction." *Id.* at 794. That description would permit relief in the case at bar, as EPA contends that hazardous waste is being discharged from the Site and that effectuation of the decree will halt the discharge. *Outboard Marine Corp.* was decided before the 1986 amendment to CERCLA and its holding that § 9604(e) did not authorize EPA to enter a waste site to effect response activities was reversed by the Supreme Court "in light of the amendment of [§ 9604(e)]" expressly to authorize EPA to enter waste sites. *Thomas v. Outboard Marine Corp.,* 479

---

7. Defendants have argued that EPA may not invoke § 9606(a) on behalf of the settling generators because the statute confers authority only on the President or his delegate. § 9606(a); § 9615. EPA has determined that effectuating the consent decree is the most expeditious and efficient method of cleaning up the Site and that the relief sought is in the public interest. Such is deemed within the authority of EPA by del-

egation which may be inferred. If that choice of methods is reviewable, which it is not, it would be for abuse of discretion. *See Charles George Trucking Co.,* 682 F.Supp. at 1272–73 & n. 18 (no judicial review of EPA's selection and implementation of response action prior to action to recover costs); § 9613(h), (j) (1988 Supp.) (timing and scope of review).

U.S. 1002, 107 S.Ct. 638, 93 L.Ed.2d 695 (1986). The case has little bearing on the issue of the proper interpretation of § 9606(a) because it did not deal with any claim under that section, because CERCLA was amended after it was decided, and because EPA did not contend that an imminent and substantial endangerment was there present. *Outboard Marine Corp.*, 773 F.2d at 886.

The "imminent and substantial endangerment" language of § 9606(a) is not limited to emergency situations, and the lesser standard urged by the government has support in the language of the statute, the legislative history, and the case law. To begin with, " 'endangerment' is not actual harm, but a threatened or potential harm." *Conservation Chem. Corp.*, 619 F.Supp. at 192. *See Reilly Tar & Chem. Co.*, 546 F.Supp. at 1109 (discussing identical language in 42 U.S.C. § 6973, § 7003 of the Resource Conservation and Recovery Act). Furthermore, "while the risk of harm must be 'imminent,' … the harm itself need not be." *Id.* (quoting House Report to the Safe Water Drinking Act, H.Rep. No. 1185, 93rd Cong.2d Sess. 35–36, *reprinted* in 1974 U.S.Code & Cong.Ad. News 6454, 6487–88). *See Price*, 688 F.2d at 211 (environmental statutes have enhanced court's traditional equitable powers). Given the importance of any threat to the public health and the reality that implementation of a remedial plan might take years, "imminence" in the pollution-abatement context must be considered " 'in light of the time it may take to prepare administrative orders or moving papers to commence and complete litigation and to permit issuance, notification, implementation, and enforcement of administrative or court orders to protect the public health.' " *Reilly Tar & Chem. Co.*, 546 F.Supp. at 1109 (quoting House Report). *See also Conservation Chem. Co.*, 619 F.Supp. at 193. Thus, an endangerment is "imminent" if conditions which give rise to it are present, even though the actual harm may not be realized for years.[8] *See Id.* at 193–94. Further, the fact that implementation may take a protracted time does not justify a finding that the threat to public health is any less imminent nor that commencement of the correction process should be delayed.

Under this standard, plaintiff's affidavits are sufficient to establish an "imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of hazardous substances." The soil, leachate and groundwater of the Site have been found to be contaminated with numerous hazardous substances, including benzene, chlorobenzene, and bis (2–chloroethyl) ether.[9] These contaminants are "hazardous substances" as defined by CERCLA. § 9601(14); § 9602(a); 40 C.F.R. Part 302, Table 302.4 (list of CERCLA hazardous substances). Benzene and bis (2–chloroethyl) ether are known to be carcinogenic.

---

**8.** The nature of the inquiry has been aptly described in *Conservation Chem. Co.*, 619 F.Supp. at 194:

> Congress' emphasis on the protection of health and the environment, and especially its approval of the use of nondefinitive data in risk assessment, means that if an error is to be made in applying the endangerment standard, the error must be made in favor of protecting public health, welfare and the environment. Thus, just as the word "imminent" does not require proof that harm will occur tomorrow, and the word "endangerment" does not require quantitative proof of actual harm, the word "substantial" does not require quantification of the endangerment (e.g., proof that a certain number of persons will be exposed, that "excess deaths" will occur, or that a water supply will be contaminated to a specific degree). Instead, the decisional precedent demonstrates that an endangerment is substantial if there is reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken, keeping in mind that protection of the public health, welfare and the environment is of primary importance. A number of factors (e.g., the quantities of hazardous substances involved, the nature and degree of their hazards, or the potential for human or environmental exposure) may be considered in determining whether there is reasonable cause for concern, but in any given case, one or two factors may be so predominant as to be determinative of the issue.

**9.** *See* Novak Affidavit, Exhibit E at 2–32–36 (EPA Feasibility Study Report); Exhibit A (EPA RIR) at 4–28–33, 4–41, 4–53–54, 4–55–63.

These contaminants present a significant risk of migration through groundwater and leachate to nearby residential wells and the Hockanum Brook (which flows to the Naugatuck River), where they may be ingested by humans and animals.[10] Benzene and bis (2–chloroethyl) ether have already contaminated two residential wells.[11] Occupants of these two residences have already been notified by the Connecticut Department of Health Services that their well water is unfit for human consumption. Novak Affidavit; Exhibit D of EPA Record of Decision at 6. Unless the situation is remedied, contaminants will continue to move in the direction of residential water supplies and surface waters, a circumstance constituting both a release of hazardous substances and an imminent and substantial endangerment. *See United States v. Seymour Recycling Corp.*, 618 F.Supp. 1, 4–5 (S.D.Ind. 1984) (though wells not yet contaminated, flow of contaminated groundwater in direction of residential wells presented an "imminent and substantial endangerment"); *compare New York v. Shore Realty*, 759 F.2d 1032, 1045 (2d Cir.1985) (leaking and seepage from earlier spills is release); *United States v. Wade*, 577 F.Supp. 1326, 1334 (E.D.Pa.1983) (leaching into soil and groundwater constitutes release);

Defendants do not dispute the accuracy of the Novak affidavit or the EPA reports and studies attached thereto. At oral argument, they declined the opportunity to present rebuttal evidence. Accordingly, it is found that the Beacon Heights Landfill Site presents an imminent and substantial endangerment to the public health or welfare or the environment caused by the release of hazardous substances within the meaning of § 9606(a).

**10.** *See* Feasibility Study Report at 2–33, 34, 36–37, 40.

**11.** Feasibility Study Report at 2–32–33.

**12.** Plaintiff refers to the relief sought as "preliminary" and both parties agree that plaintiff must meet some version of the preliminary injunction standard. *See* Plaintiff's Memorandum in Support at 20–21; Defendants' Memorandum in Opposition at 17. In actuality, the relief is more akin to a final injunctive order to abate a public nuisance. *See, e.g., State of New York v. Shore*

### C. Public Interest and the Equities

■ Once a finding of endangerment is made under § 9606(a), there is no requirement that a showing of threatened irreparable harm—the classic preliminary injunctive threshold—be made before an injunction may issue. In this respect, the formulation urged by EPA and discussed above is adopted.[12] The statute expressly directs consideration of the "public interest and the equities of the case." It is appropriate, therefore, to consider such traditional equitable concerns as the availability of an adequate remedy at law; the possibility of harm to the non-moving party if relief is granted, the likelihood of success on the merits; and the public interest. *See, e.g., Price*, 688 F.2d at 211 (discussing injunctive relief under environmental protection statutes); *Standard & Poor's Corp. v. Commodity Exchange*, 683 F.2d 704, 711 (2d Cir.1982) (consideration of the public interest); *cf. Industrial Park Development Co. v. EPA*, 604 F.Supp. 1136, 1141 (E.D.Pa.1985) (declining to enjoin EPA from undertaking cleanup under § 9604 and § 9606(a)).

■ First, despite defendants' claims, EPA does not have an adequate remedy under other provisions of CERCLA. Section 9604(a) and (3) permit EPA to perform response activities at the Site; § 9606 permits an order or court action to compel defendants to do so. Restriction to neither alternative would not be fully consistent with CERCLA's purposes to expedite cleanup, to conserve federal resources, and to shift cleanup burdens to the widest array of responsible persons. Moreover, time and public resources have been spent to formulate and establish the consent decree,

*Realty Corp.*, 759 F.2d 1032, 1050–52 (2d Cir. 1985) (upholding summary judgment granting permanent injunction under common law of public nuisance where injunctive relief not available under CERCLA). This is in part a consequence of the structure of CERCLA which fosters early initiation of cleanup and defers litigation of cost-liability issues. In any event, the finding made here warrants, if not requires, that EPA be empowered to proceed with the remedial program deemed necessary.

which is presently the only vehicle for a prompt cleanup. Defendants have offered no alternative. The public has an interest, and right, in seeing the decree implemented. *See, e.g., Industrial Park Development Co.*, 604 F.Supp. at 1144 (suggesting that public interest better served when responsible party is ready and willing to accomplish cleanup).

EPA has also shown a likelihood of success on the merits, i.e., that defendants will eventually be found liable for the costs of cleanup under § 9607.[13] "Liability under [§ 9606(a)] rests upon a finding that the defendant(s) fall( ) within one of the classes of liable parties described by § 9607(a)(1)–(4)." *Bliss*, 667 F.Supp. at 1313. *See also Conservation Chem. Co.*, 619 F.Supp. at 184, 191–92; *United States v. Outboard Marine Corp.*, 556 F.Supp. 54, 57 (N.D.Ill.1982), *rev'd on other grounds, Outboard Marine Corp. v. Thomas*, 773 F.2d 883 (7th Cir.1985); *Price*, 577 F.Supp. at 1113. For the purposes of this motion, there is no dispute but that defendants are both *current* "owner and operator" of the Site, § 9607(a)(1), and persons "who at the time of disposal of any hazardous substance(s) owned or operated any facility at which such hazardous substances were disposed of." § 9607(a)(2). Thus, the government has made a prima facie showing of liability under § 9607(a). *Bliss*, 667 F.Supp. at 1304.

Moreover, there are no issues of causation or fault. A person need not have generated the hazardous substances to be held liable under § 9607(a). *Bliss*, 667 F.Supp. at 1306. The person need only have, or have had during the time wastes were deposited, control over the facility or the hazardous substances involved. *See, e.g., United States v. Northeastern Pharmaceutical & Chem. Co.*, 810 F.2d 726, 743 (8th Cir.1986) (control critical to determining liability); *Bliss*, 667 F.Supp. at 1306–07; *Shore Realty*, 759 F.2d at 1044. Responsible persons under § 9607(a)(1)–(4) are strictly liable for response costs without regard to fault, subject only to the affirmative defenses of § 9607(b). *Shore Realty*, 759 F.2d at 1042, 1044; *Violet v. Picillo*, 648 F.Supp. 1283, 1290 (D.R.I.1986). Defendants have not asserted any affirmative defense for the purposes of this motion for access.

CERCLA does not set out an express standard of causation. Here, however, where defendants owned and operated the landfill Site through the period during which hazardous wastes were deposited there, there is nothing in the record to suggest that causation will be an issue as to defendants' liability. *Cf. Shore Realty*, 759 F.2d at 1044–45 (no causation requirement in § 9607(a)). Accordingly, on the strength of the prima facie case, EPA has shown a likelihood of success on the merits.

Finally, defendants have not demonstrated that they will suffer harm if an injunction enters. As the Site is presently inactive and is contaminated with hazardous wastes, effectuation of the consent decree is not shown to interfere with any ongoing productive use of the property.[14] While defendants claim that they will be subjected to potential liability to third parties and those entering the Site during the remedial activities, this claim is, at best, speculative. It is not a sufficient showing of harm to forestall an injunction.[15] Defendants have

13. The Site is clearly a "facility" from which hazardous wastes have been threatened to be "released" within the meaning of § 9607(a). The United States has incurred "response costs" caused by the release or threat of release. § 9607(a); Affidavit of Heather M. Ford, ¶ 9. Thus, the first three elements of a prima facie case for liability under § 9607(a) are not in dispute. *See, e.g., United States v. Bliss*, 667 F.Supp. 1298, 1304 (E.D.Mo.1987); *Conservation Chem. Co.*, 619 F.Supp. at 184.

14. To the extent the implementation of the remedy works an effective taking of defendants' property, defendants may be able to pursue a justiciable claim in the Court of Claims pursuant to the Tucker Act, 28 U.S.C. § 1491, but such a claim would not be grounds to oppose access. *Charles George Trucking Co.*, 682 F.Supp. at 1271; § 9604(j)(1) (no cause of action to compel taking).

15. Even if it were assumed that EPA and the settling parties will commit negligent acts on defendants' land causing injury to others, it is doubtful that such acts could provide an independent basis to impose liability upon defendants. CERCLA does not contain a provision imposing liability for personal injuries. It is difficult to foresee how the actions of EPA and

other avenues available by which to avoid third-party liability.

Accordingly, the motion for an order in aid of access and for a preliminary injunction to permit EPA and the parties to the consent decree to conduct response activities at the Site is granted. An appropriate order shall issue consistent herewith.

SO ORDERED.

third parties, performed pursuant to an injunction and consent decree, could impose liability on defendants not already imposed as a result of their own past actions on the land. Moreover, to the extent EPA could order defendants themselves to effectuate the same remedy at the Site, they would incur potential liabilities similar in kind and degree to those they profess to fear. The combination of the speculative nature of defendants' fears and the unlikelihood that grant of the injunction will significantly affect defendants' overall "liability picture" weakens their claims on the equities.