**In re Claude RANCOURT, et al., Debtor.**

**Bankruptcy Nos. 90–11957
through 90–11961.**

United States Bankruptcy Court,
D. New Hampshire.

June 12, 1992.

Stephen Darr, Thornton, N.H., Trustee for DIP.

Robert Walsh, Bielagus Law Office, Bedford, N.H., for Official Special Committee of Creditors.

Steve Ellis, Goodwin, Proctor & Hoar, Boston, Mass., for DIP.

Bruce Harwood, Sheehan, Phinney et al, Manchester, N.H., for LRS Enviro–Services.

Howard Coffman, Stephen Darr, Trustee, Thornton, N.H., for Scott Larson Groups.

Greg Jaffe, Washington, D.C., for Dept. of Justice.

## MEMORANDUM OPINION AND ORDER

JAMES E. YACOS, Bankruptcy Judge.

This matter came on for a continued hearing before the Court on June 5, 1992, on the chapter 11 trustee's "Motion for Order Authorizing Chapter 11 Trustee to Pay Increased Amounts to Environmental Contractors" and "Motion for Order Authorizing Chapter 11 Trustee to Expend Estate Funds for Environmental Remediation and to Enter into Contracts Incident thereto."

At the conclusion of the hearing, the Court made two bench rulings, denying the former and granting the latter subject to certain limitations described more fully below. The following constitutes the Court's findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052.

### FINDINGS

The condition of the site in question was previously considered at a hearing on September 27, 1991. By order dated October 3, 1991, the Court directed the debtor to comply with the United States Environmental Protection Agency's ("EPA") Second Administrative Order for Removal Action dated September 3, 1991. The Court's order authorized the expenditure of up to $495,000 toward this end based on the parties' stipulation in open court that the site was an imminent and substantial endangerment to public health.[1]

---

**1.** The Court has since discovered, as a result of the June 5, 1992 hearing, that the phrase "immi-

nent and substantial endangerment to the public health or welfare or environment" is a term

Based on the factual record developed at the June 5, 1992, hearing, I find that except for the exposed areas where there is asbestos soil contamination exposed due to the recent washouts there is no imminent danger to public health and safety in the site as it now exists. I apply the *present* factual standard appropriate for Bankruptcy Code purposes (see footnote 1 supra) and not the CERCLA standard appropriate for purposes of *initiating* administrative agency activity.[2]

This takes into consideration the fact that the western portion of the site from the western boundary point to the point designated as the "3 plus 00" coordinate has been stabilized with a permanent cap consisting of at least 30 inches of gravel and 18 inches of rip rap rock with a substantial berm at the bottom by a rock toe, as it's referred to, which is basically an anchor into the river that will prevent that area and the rock and gravel from sliding. The work thus completed encapsulates the asbestos that is in that area so there should be no danger to public health or safety from either contact with such asbestos or any airborne flaking off of asbestos fibers.

With regard to the middle area of the site from coordinates "3 plus 00" to "4 plus 00" the evidence establishes that there is some 30 to 48 inches of gravel that has been put on that area as an interim measure by the contractor together with a drainage device to eliminate heavy concentrated water flow from the upper property over the subject area. The middle area has shown no erosion damage since the interim cap was placed on that area in late 1991 or January, 1992, and with monitoring it should continue in that condition at least until next winter. If there is any erosion in that area the trustee can eliminate any imminent danger to public health and safety by appropriate additional gravel placements.

With regard to the portion of the property from coordinates "4 plus 00" to "5 plus 00" the evidence does establish that the interim gravel placement in that area was not sufficient to withstand erosion this Winter and Spring and there are some uncovered areas of soil contaminated with asbestos fibers in that area ranging from 5 to 25 percent.

With regard to this area the record establishes that the areas exposed should be able to be covered with gravel to a depth of 6 to 12 inches by applying approximately 150 tons of gravel including some areas

of art as it is written and used in the CERCLA statute. 42 U.S.C. § 9606(a). An endangerment finding by the EPA authorizes it to commence an abatement action. The point here is that the EPA's determination of endangerment may be premised on the possibility or threat of a risk to the public health and welfare which may materialize in the future from existing conditions although there is no present threat. *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 191–94 (N.D.Mo.1985); *B.F. Goodrich Co. v. Murtha*, 697 F.Supp. 89, 96–97 (D.Conn.1988), *aff'd, B.F. Goodrich v. Murtha*, 958 F.2d 1192 (2d Cir.1992). This counterintuitive specialized meaning differs from the traditional understanding of the phrase "imminent and substantial risk to the public health and welfare" as that phrase was analyzed by the Supreme Court in *Midlantic Bank v. New Jersey Dept. of Envt'l Protection*, 474 U.S. 494 n. 9, 106 S.Ct. 755 n. 9, 88 L.Ed.2d 859 (1985). ("This exception to the abandonment power vested in the trustee by § 554 is a narrow one. *It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from immi-*

*nent and identifiable harm.*") (emphasis added). The EPA administrative record received into evidence in this case contains no such finding of actual present identifiable harm although it does make the CERCLA statutory finding.

Since the *Midlantic* decision, courts have reached opposite results in determining whether an imminent and substantial harm exists for purposes of denying a debtor or trustee's motion to abandon contaminated property pursuant to 11 U.S.C. § 554. *Compare In re Smith–Douglass*, 856 F.2d 12 (4th Cir.1988) (unconditional abandonment ordered where bankruptcy court found violation of state environmental laws but did not find any imminent and substantial risk to public) *with In re Stevens*, 68 B.R. 774 (D.Me.1987) (the court found that illegal and improper storage of hazardous substances constitutes an imminent and identifiable harm); *Peerless–Plating*, 70 B.R. 943 (Bankr. W.D.Mi.1987) (Under Midlantic, trustee cannot abandon property in violation of CERCLA).

2. As indicated, I was not aware of this important distinction when I entered the October 3, 1991, Order upon the stipulation of the parties as to the condition of the site.

that the contractor may find should be covered to a greater depth. The evidence before me supports a finding that if the gravel is placed upon it as indicated by the contractor that should eliminate any imminent danger to public health and safety and I so find. The cost of such gravel placement should be less than $4,000.

With regard to the factual record on this specific area it is arguable that if there is a washout or something that exposes some of this soil that has asbestos, and if that is not covered quickly, then there could be some airborne asbestos fibers emanating from that soil. However, the only record basis I have for that finding is the "common sense" observation of one of the witnesses that when asbestos becomes dry or "friable" it can be picked up by the wind and/or by people walking across it and that to some extent it could get in the air. This record does not establish any quantitative measure as to how serious a danger that possibility might present to the public health and safety. Taking that aspect of the record together with the fact that any exposure should be very short-lived, in view of my order and direction to the trustee to monitor the situation and to immediately cover any such exposure, I find that there will not be any danger or imminent danger to public health and safety from any such washout, in terms of airborne pollution or airborne asbestos fibers, during the time-frame for finally resolving the disposition of the subject site encompassed by the specific further provisions of this order.[3]

With regard to the remaining area from coordinate "5 plus 00" to the Easterly boundary of the property, the samples taken to date show no asbestos soil contamination but only ¼ of the samples that should be taken have been taken so far and it's possible that the other ¾ of samples to be tested might show some involvement. But as of now on this record it does not show there is any imminent danger to public health and safety in that area. If any such

danger should appear from the further tests the trustee is authorized to take corrective action in this area similar to that approved for the "4 plus 00" to "5 plus 00" area under this Order.

CONCLUSION

■ 1. The "Motion For Order Authorizing Chapter 11 Trustee to Expend Estate Funds for Environmental Remediation and to Enter into Contracts Incident Thereto" to complete the work required under the EPA Administrative Order will be granted as follows: (1) the motion is granted only to the extent of an authorization to expend up to $10,000 to cover the exposed asbestos areas that have been eroded as developed by the record and set forth above; (2) if it is determined by the chapter 11 trustee, the environmental contractor, and the EPA, consulting together, that $10,000 will not be sufficient to cover the exposed wash-out area then the chapter 11 trustee may return to this Court seeking additional monies to stabilize any resulting imminent threat to the public health and in that regard I remain available for a quick hearing on the telephone if necessary to authorize such additional placement of gravel if the $10,000 amount is insufficient; and (3) the funds so authorized should also be used for monitoring of the site to immediately detect and cure any further washouts.

2. Except for the $10,000 presently authorized by this Order, the rest of the aforesaid motion is denied, without prejudice to the trustee bringing an appropriate adversary proceeding, whether by declaratory judgment or otherwise, or some combination thereof, to determine the rights and liabilities of all parties affected by this matter. This specifically should include the contention by the EPA that it can require enforcement of its administrative determinations regarding the clean-up of the subject site notwithstanding the bankruptcy filing and any conflicting provisions of the Bankruptcy Code and subject only to

---

**3.** Since the subject site came to the attention of environmental authorities in 1986, and throughout earlier activity by both the state and federal authorities, no scientific monitoring of air quality emanating from the site to detect and quantify any airborne asbestos danger from the site has been performed by any environmental agency including the EPA to date.

an "arbitrary and capricious" review standard or a showing that its determinations are otherwise not in accordance with law.[4] The chapter 11 trustee is authorized and directed to file such pleading by no later than *June 26, 1992.* The calendar clerk is directed to make time available in September so that a hearing on the chapter 11 trustee's adversarial proceeding can come on for hearing before Winter and next Spring when freezing and thaws, and resulting frost heaves and other climatic conditions, might disrupt the present interim measures accomplished and authorized by this order.

3. The "Motion for Order Authorizing Chapter 11 Trustee to Pay Increased Amounts to Environmental Contractors", in excess of the amount of $495,000 specified as a cap in my prior order of October 3, 1991, is denied, again without prejudice to consideration of those matters in the adversary proceeding referred to above. However, the contractor LRS Enviro–Services, Inc. ("LRS") is hereby authorized reimbursement of the expenditure of $98,-955 under Change Order No. 2 as to which I can and do make a finding that such work was essential to eliminate any imminent harm to public health and safety in the middle portion of the site and that this amount is substantially within the unexpended contract amount. The authorization of this specific expenditure by this Order does not constitute any modification of the prior Order dated October 3, 1991, but is being authorized on the basis that the present factual record before the Court clearly establishes that the work that was done by LRS in the middle portion did provide an interim cure for an imminent danger to public health and safety in the subject site that necessarily would have to be authorized by the Court.

4. This order is also without prejudice to LRS Enviro–Services, Inc. or any other unpaid contractors' rights in the succeeding adversary proceeding to assert claims for additional payments from this estate.

4. See Memorandum of United States of America, filed June 3, 1992 (Ct. Doc. No. 613), pp. 16–17.

5. Finally, the Court takes these interim actions not on the basis of any final determination of the rights and powers of the EPA, or the rights and obligations of any party, regarding the clean-up of the subject site but rather merely to preserve the site free of any actual imminent danger to public health and safety until a full hearing can be held as to the expenditure of funds of this estate *in a context in which all parties affected by such expenditure are before the Court* in an appropriate proceeding under Rule 7001 of the Federal Rules of Bankruptcy Procedure.

DONE and ORDERED.