**UNITED STATES of America**

v.

**M. GENZALE PLATING, INC., Michael Genzale, and Pasquale Genzale, Defendants.**

**No. CV 89–2992.**

United States District Court, E.D. New York.

Oct. 13, 1989.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., and Lisa M. Burianek, Sp. Asst. U.S. Atty., Brooklyn, N.Y., Bernard P. Bell, Trial Atty., Environmental Enforcement Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., and James F. Doyle, Asst. Regional Counsel, Office of Regional Counsel, U.S.E.P.A. —Region II, New York City, for U.S.

Yannacone & Yannacone (Victor Yannacone, of counsel), Patchogue, N.Y., for defendants.

## MEMORANDUM DECISION

MISHLER, District Judge.

This court has been presented with several questions arising under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA" or "the Act"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA" or "the 1986 amendments"), 42 U.S.C. § 9601 *et seq.* The United States of America moves for a mandatory injunction to enforce an administrative order which was issued pursuant to 42 U.S.C. § 9604(e)(5)(A). The administrative order requests access onto the site of the plating facility belonging to the defendant, M. Genzale Plating Co., Inc. ("Genzale" or "Genzale Plating"). Genzale cross-moves to enjoin the United States from entering its premises.

### FACTS

M. Genzale Plating Co., Inc., is a family-owned business that has been operating in Franklin Square, Nassau County, New York, since 1915. Genzale plates metals on

a retail basis. From 1915 until sometime in the mid 1950s, liquid wastes from the plating process were discharged into three leaching pools located on the Genzale premises. In or around 1955, the facility was connected to the Nassau county sewer system, at which time, according to Genzale, it ceased discharging liquid wastes into the leaching pools.

In April 1981, an inspection conducted by the Nassau County Department of Health ("NCDH") revealed that liquid waste was being discharged into at least one of the leaching pools. Genzale was ordered to stop the discharge. The NCDH inspector returned the next day and found that Genzale had complied with this order. It is unclear whether the discharge observed in 1981 was occurring purposefully or as a result of some accident.[1] NCDH tests of the liquid wastewaters, performed in 1981, showed concentrations of heavy metals in excess of federal and state effluent limitations. *See* 9/13/89 hearing, Plaintiff's exhibit 2c. Tests done in 1983 by NCDH showed heavy metal contamination of the soil located in and around the leaching pools. *Id.*, Plaintiff's exhibits 2a and 2b. The Genzale facility is located over a sole-source aquifer for Franklin Square municipal and private water supplies and within three miles of the West Hempstead–Hempstead Water District well.

Due to the results of the NCDH tests, the New York State Department of Environmental Conservation ("NYSDEC") engaged a private consulting firm to conduct a preliminary investigation of the Genzale Plating site. This investigation was completed in September 1983. The results of the independent investigation led NYSDEC to nominate the Genzale facility for inclusion on the National Priorities List ("the NPL"), a list of hazardous waste sites established pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605.

The Genzale site was scored under a hazardous ranking system set forth in regulations promulgated pursuant to CERCLA. *See* 40 C.F.R. Part 300, Appendix A. The regulations designate a threshold score for inclusion on the National Priorities List; this score is 28.5. 40 C.F.R. Part 300, Appendix B. The Genzale facility was listed with a score of 28.9. The site was proposed for inclusion on the NPL on June 10, 1986. 51 Fed.Reg. 21099 (1986). The site was formally included on August 21, 1987. 52 Fed.Reg. 27620 (1987).

In July 1986, the Environmental Protection Agency ("the EPA") began requesting information from Genzale regarding the toxic chemicals used at the plant, the ability of Genzale to finance and conduct remedial investigations and cleanups of the site, and other related matters. In December 1987, the EPA sent Genzale Plating a special notice letter, pursuant to Section 122 of CERCLA, 42 U.S.C. § 9622, which commenced a statutorily prescribed negotiation period within which any agreement to conduct response activities must be formalized. During this time, the EPA determined that Genzale Plating was financially incapable of conducting a remedial investigation feasibility study ("RI/FS");[2] thus the EPA directed its contractor, EBASCO Services, Inc., to prepare a work plan for the performance of an RI/FS. EBASCO's work was completed in September 1988, and the EPA has since been attempting to gain access to the Genzale site to conduct the field work required for the RI. Genzale has steadfastly refused to allow the EPA to enter its property, insisting that it will not grant access unless the United States agrees not to commence a cost-recovery action against Genzale in the event

---

1. Genzale instituted an action against its insurer, claiming that the discharge was accidental. Genzale has added the United States as a party to that action; the government has moved for dismissal. *M. Genzale Plating Co., Inc. v. Aetna Casualty & Surety*, Docket no. CV 89–2002 (E.D. N.Y., filed June 15, 1989).

2. An RI/FS has two phases: (1) the remedial investigation, which determines the source and extent of contamination at a site and the need for further remedial action, and (2) the feasibility study, which details and evaluates specific engineering or construction alternatives for cleanup. 40 C.F.R. § 300.68(d). *See also* Brief for the United States, at 9 n. 8.

no toxic substances are discovered on the site.

On August 3, 1989, the EPA issued an administrative order pursuant to its power under section 104 of CERCLA, 42 U.S.C. § 9604(e)(5)(A), directing that Genzale comply with the EPA's request for access.[3] After its receipt of the order, Genzale requested a conference with the EPA, as was permitted by the administrative order. At this conference, Genzale asked for more time, so that it could pursue the claim against its insurance carrier, Aetna Casualty & Surety, for reimbursement of costs arising out of the 1981 discharge. The EPA refused this request, explaining that, regardless of the outcome of Genzale's claim against its insurer, the RI/FS would be performed.

There is some question as to the extent of remedial work done on the Genzale site after the 1981 release. In 1983, Genzale entered into a stipulation and order by consent with the New York State Department of Environmental Conservation. The stipulation and order required that Genzale hire an engineer to conduct sampling and analysis of soil and groundwater at the plating facility, to put in at least four observation wells, to propose and implement a plan for cleanup at the site, and to pay a penalty of $30,000, most of which was suspended provided that the rest of the terms of the stipulation and order were fulfilled. *In the Matter of Alleged Violation of Article 17 of the New York State Environmental Conservation Law by M. Genzale Plating Co., Inc.* (Tr. 1/25/83 hearing, at 109–10).

There is some evidence that testing was done by a private firm and that at least some of the sludge from the bottom of several, if not all, of the leaching pools was removed and carted to a waste disposal facility.[4] NYSDEC claims that Genzale did not complete the work required by the stip-

ulation and order, and is currently pursuing the recovery of the suspended portion of the penalty assessed in 1983. *New York v. M. Genzale Plating Co., Inc.,* Index No. 3302/89 (Sup.Ct. Nassau Co., filed June 22, 1988). Genzale maintains that it did comply with the 1983 stipulation and order. As will become clear, Genzale's compliance, or noncompliance, does not affect the outcome of these proceedings.

## ISSUES

The government claims that all it need show in order to obtain the relief it requests is that there has been a release, or is a substantial threat of a release, of a hazardous substance into the environment, and upon such showing, the EPA must be given access onto the site of the release in order to perform remedial or investigatory activities. The government urges that our review is limited to the determination of whether the EPA's order or request for access was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 9604(e)(5)(B).

Genzale, on the other hand, challenges the EPA's authority to enter the Genzale facility without an agreement by the United States that it will not impose liability for the costs of EPA action upon the Defendant if the RI does not uncover contamination at the plating facility. Genzale argues that the standard the EPA must meet is a showing of "imminent hazard to public health or welfare" or "imminent danger to the environment." (Tr. 9/13/89 hearing, at 9.) Genzale asserts that it is an inactive hazardous waste site and thus does not fulfill this standard. Finally, Genzale objects to its placement on the National Priorities List, claiming that its constitutional rights to due process of law have been

---

**3.** The order in issue is Administrative Order, Index No. II CERCLA–90222, dated August 3, 1989, effective August 25, 1989.

A party who does not have a reasonable basis for disregarding an administrative order can be fined up to $25,000 for each day of noncompliance. 42 U.S.C. § 9604(e)(5)(B).

**4.** The sludge removed from the Genzale site was carted to the Glenwood Landing facility, which became the subject of another lawsuit, into which Genzale was later impleaded as a third-party defendant. *See New York v. Shore Realty Corp.,* CV 84–0864 (E.D.N.Y.1984) *aff'd,* 759 F.2d 1032 (2d Cir.1985). The events involved in the *Shore Realty* case are not relevant to a determination of the issues before us.

violated, and it requests injunctive relief. There is nothing complicated about Genzale's position. The problem is that some of Genzale's arguments are being made too early, while others have been made too late.

## LAW

We have arrived at the point at which the statutory maze known as CERCLA must be encountered and carefully travelled through. Although an exposition on the mechanics of CERCLA is far from exciting fare, when dealing with a statute of the comprehensiveness and density of CERCLA's dimensions, it is wise to spell out a few particulars.

■ The purpose of CERCLA is to enable the President to target and clean up hazardous waste sites in an efficient manner. *See, e.g., J.V. Peters & Co., Inc. v. Administrator, EPA,* 767 F.2d 263, 264 (6th Cir.1985). The Superfund amendments of 1986 clarified and strengthened the President's authority to obtain access to sites in order to achieve CERCLA goals. *See* H.Rep. 99–253, Part I, 99th Cong., 1st Sess. 54, 57, 70–71 (1985), U.S.Code Cong. & Admin.News 1986, 2835. The President has delegated the responsibility of implementing and enforcing CERCLA, as amended by SARA, to the Administrator of the EPA. Exec.Order No. 12580, 52 Fed. Reg. 2923 (1987).

Section 105 of CERCLA provides for a hazardous ranking system to be used by the EPA to determine the seriousness of a toxic waste problem. 42 U.S.C. § 9605. Corresponding regulations set forth the actual ranking system. 40 C.F.R. Part 300, Appendix A (Uncontrolled Hazardous Waste Site Ranking System). Sites that receive a ranking of at least 28.5 can be named to the National Priorities List. 40 C.F.R. Part 300, Appendix B. After a site has been formally included on the NPL, CERCLA and regulations promulgated pursuant to the act provide for certain steps to be taken in order to restore NPL sites to acceptable environmental standards. An RI/FS is one of the initial actions undertaken by the EPA in the restoration process. *See* 42 U.S.C. § 9616(e); 40 C.F.R. § 300.68(d).

■ Placement on the National Priorities List is done by promulgating a regulation to that effect, pursuant to standard notice-and-comment rulemaking procedures. *See* 5 U.S.C. § 553. *See also* 42 U.S.C. § 9605(a)(8)(B); 40 C.F.R. § 300.68(c). After a site is proposed for inclusion on the NPL, interested parties are given 60 days within which to file comments and/or objections to the proposed inclusion. *See Northside Sanitary Landfill, Inc. v. Thomas,* 849 F.2d 1516, 1518 (D.C.Cir.1988), *cert. denied,* ——— U.S. ———, 109 S.Ct. 1528, 103 L.Ed.2d 833 (1989). Once the site has been formally included on the NPL, a party with standing may challenge the listing. 5 U.S.C. § 553(e). The challenge must be brought in the District of Columbia Court of Appeals within 90 days of the date of formal inclusion. 42 U.S.C. § 9613(a). If a challenge is not made within these 90 days, review is foreclosed in any other context. *Id. See also Eagle–Picher Indus., Inc. v. EPA,* 759 F.2d 905, 911 (D.C.Cir.1985).

Once a site is listed on the NPL, CERCLA mandates that an RI/FS be commenced in accordance with a designated schedule. 42 U.S.C. § 9616(e). CERCLA also provides the EPA with the requisite authority to obtain access to a facility in order to perform the RI/FS. 42 U.S.C. § 9604(e)(3)(A)-(D). If a party will not consent to access, the EPA may issue an administrative order directing compliance. 42 U.S.C. § 9604(e)(5)(A). Finally, whether or not an order has been issued, the EPA can request the Attorney General to commence a civil action in United States District Court to compel compliance with the EPA's order or request. 42 U.S.C. § 9604(e)(5)(B). The District Court may, in its discretion, impose a civil penalty of up to $25,000 for each day of noncompliance with the EPA's request and/or administrative order. *Id.*

■ CERCLA also enables the United States to recover costs of response and remedial actions from responsible parties, imposing, in essence, a type of strict liabili-

ty on such persons. 42 U.S.C. § 9607. A subdivision of this section grants to the United States a lien on real property that (1) belongs to responsible parties and (2) is subject to or affected by a removal or remedial action. 42 U.S.C. § 9607(*l*). The recovery of costs is, however, discretionary; it is up to the government to commence a cost-recovery action in order to obtain any reimbursement for Superfund amounts spent on removal and/or remedial actions. 42 U.S.C. § 9607(a). Thus, if the government does not commence a cost-recovery action within a specified time, *see* 42 U.S.C. § 9613(g), a responsible party will not be required to pay for the costs of any action taken by the EPA.

■ If and when the United States does commence a cost-recovery action, a defendant to the action has the opportunity to set up statutorily specified defenses, *see* 42 U.S.C. § 9607(b), and also may challenge the necessity and cost-effectiveness of the government's responses as well as litigate the question of whether he is, in fact, a responsible party. *See, e.g., Wagner Seed Co. v. Daggett,* 800 F.2d 310, 315, 317 (2d Cir.1986).[5]

More specifically, in a 1986 amendment to CERCLA, Congress expressly foreclosed court review of the merits of the remedy chosen by the EPA when it is acting under Section 104. 42 U.S.C. § 9613(h). This section provides:

> Timing of Review. No Federal court shall have jurisdiction under Federal law ... to review any challenges to removal or remedial action under section 104 [42 U.S.C. § 9604] ... in any action except one of the following:
>
> (1) An action under section 107 ... to recover response costs or damages or for contribution.

(2) An action to enforce an order issued under section 106(a) ... or to recover a penalty for violation of such order.

(3) An action for reimbursement under section 106(b)(2)....

(4) An action under section 310 ... alleging that the removal or remedial action taken under section 104 ... or secured under section 106 ... was in violation of any requirement of this Act. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

(5) An action under section 106 ... in which the United States has moved to compel a remedial action.

*See also United States v. Charles George Trucking Co.,* 682 F.Supp. 1260, 1272 (D.Mass.1988).

## DISCUSSION

We discuss Genzale's arguments.

*Challenge to Genzale's Placement on the NPL*

■ The simplest argument with which to dispose is Genzale's challenge to its listing on the NPL. This court does not have the subject-matter jurisdiction to review regulations placing facilities on the National Priorities List. As previously noted, only the District of Columbia Court of Appeals has jurisdiction over this issue. *See* 42 U.S.C. § 9613(a). Furthermore, even if this court did have jurisdiction, the 90–day period during which the issue is reviewable has elapsed. *Id. See also Eagle–Picher Indus., Inc. v. EPA,* 759 F.2d 905, 908–09 (D.C.Cir.1985) (Challenge to EPA regulation must be made within 90 days after promulgation).

■ The EPA did not receive any comments on its proposed addition of the Genzale site to the NPL, nor was formal inclu-

---

5. *Wagner Seed* deals with the specific question of whether the EPA can be enjoined from enforcing an administrative order issued under Section 106 of CERCLA. This section requires the EPA to show "imminent and substantial endangerment to public health or welfare or the environment because of [a] release." 42 U.S.C. § 9606(a). The showing required for action taken under Section 104 is not so stringent.

The rationale behind the preclusion of court review prior to the cost-recovery action is the same, no matter whether the EPA is acting pursuant to Section 106 or Section 104. The EPA needs the flexibility and power to respond to releases promptly. *See Dickerson v. Administrator, EPA,* 834 F.2d 974, 978 (11th Cir.1987) (Preenforcement court review of type of remedial action chosen is precluded when the EPA is acting pursuant to Section 104 of CERCLA).

sion on the NPL challenged in the District of Columbia Court of Appeals pursuant to section 113 of CERCLA. *See* Declaration of Alison Hess ¶ 14. Therefore, Genzale is foreclosed from challenging the listing now.

*Due Process Challenges*

■ Genzale urges that its placement on the NPL violates its rights to due process of law (Defendant's post-hearing memorandum of 9/21/89 at 2–4). Clearly this argument is unavailing. The essential elements of due process are notice and an opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

■ Genzale was given notice, both of the government's proposal to add the Genzale site to the NPL and of its formal inclusion on the list. It was, likewise, given the opportunity to comment upon the proposal and challenge the final listing. This is all that due process requires.

■ Similarly, the prohibition of pre-enforcement court review of action undertaken by the EPA pursuant to CERCLA Section 104 does not offend due process. *See Lone Pine Steering Committee v. EPA*, 777 F.2d 882, 886–87 (3d Cir.1985), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986); *J.V. Peters & Co., Inc. v. Administrator, EPA*, 767 F.2d 263, 266 (6th Cir.1985).

■ Genzale makes a number of other arguments which, perhaps, could be stretched to fit under the banner of due process, but these arguments were not delineated as due process challenges. Rather, they can just as easily be characterized as general grievances, and the court so considers them. Vague assertions of unfairness on the part of the government, without more, cannot be molded by the court into constitutional violations.

*Challenges Regarding the Cost of the RI/FS*

Genzale stated repeatedly that it would not deny access to its facility so long as the government agreed to waive its rights to commence a cost-recovery action if no hazard to the public health were uncovered by the RI/FS. Counsel for Genzale stated: "We are not arguing with the fact that the statute says what the statute says. We are not arguing with the EPA's power to do what EPA purports to want to do. The issue in this case is not can it, but should it?" (Tr. 9/13/89 hearing, at 5.)

Thus, Genzale appears to concede that the EPA has the requisite power and authority to conduct the RI/FS; it merely questions whether it is wise for the study to be conducted.[6]

■ This is not a legally sufficient basis for conducting a pre-enforcement inquiry into the type of action chosen by the EPA.

Genzale expresses concern about cost and its potential liability. However, this court is without jurisdiction to inquire further into the type and cost of the proposed RI/FS. Nor can this court review the issue of Genzale's responsibility, if any, for the costs of the RI/FS at this time. These are questions that can be raised when and if a cost recovery action is commenced against Genzale.

*Standard of Review*

■ The Act is clear on this issue: Congress has entrusted the President with the power to conduct response and remedial activities under Section 104; court review is expressly precluded until a cost-recovery action is commenced. 42 U.S.C. § 9613(h). *See also United States v. Charles George Trucking Co., Inc.*, 682 F.Supp. 1260, 1271–72 (D.Mass.1988). Therefore, at this juncture, review is limited to that set forth in Section 104 of CERCLA:

**6.** Genzale's concern is that a study costing in the area of 1.2 million dollars will be performed on a property estimated to be worth about half that amount. We recognize this but are also cognizant of the importance of keeping our environment safe. CERCLA liability can include the cost of all response actions plus up to 50 million dollars in damages accrued under the Act. *See* 42 U.S.C. § 9607(c).

Where there is a reasonable basis to believe there may be a release or threat of a release of a hazardous substance or pollutant or contaminant, the court shall take the following actions:

(i) In the case of interference with entry or inspection, the court shall enjoin such interference or direct compliance with orders to prohibit interference with entry or inspection unless under the circumstances of the case the demand for entry is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

42 U.S.C. § 9604(e)(5)(B).

The United States has presented evidence that there was a release, in 1981, of at least five substances—chromium, copper, iron, nickel, and zinc—that have been classified as hazardous pursuant to CERCLA regulations. *See* 40 C.F.R. § 302.4 (Designation of hazardous substances). Tests done in 1983 confirm the continuing presence of these substances at the Genzale site. And the Genzale site was included, without objection, on the National Priorities List in 1987.

■ Genzale does not persuade the court that the government is not acting in accordance with the Section 104 standard. Genzale's statement that it is arbitrary and capricious for the government to conduct a 1.2 million dollar study on a property worth half that amount (Defendant's post-hearing memorandum of 9/21/89, at 2–4) does not cast doubt on the reasonableness of the EPA's request for access. EPA action is required by statute to be cost-effective. 42 U.S.C. § 9605(a)(7). It is conceivable, to this court, that the cost of an environmental cleanup could exceed the market value of the property involved. Cost is not an answer to the danger presented by a hazardous site.

■ That the Genzale site may be classified as an "inactive hazardous waste site" (Tr. 9/13/89 hearing, at 9, statement of counsel for Genzale) is not a determinative factor in these proceedings. The United States is seeking access in order to perform an RI/FS. It needs to conduct this activity because Genzale is on the NPL and, therefore, must be evaluated and "de-listed." *See* 42 U.S.C. §§ 9604(a), 9616(e). Whether Genzale is an active contaminator is of no moment in assessing the reasonableness of a Section 104 request. According to the language of Section 104, what is of consequence is whether there was a release of a hazardous substance. 42 U.S.C. § 9604(a) and (e).

■ Nor can we examine the merits of the EPA's chosen action merely because CERCLA has a provision which lets the government place a lien on certain types of real property.[7] The property must belong to a party who is responsible for costs, and it must be subject to or affected by EPA action taken to respond or remedy the release of a hazardous substance. 42 U.S.C. § 9607(*l*)(1).

■ The lien is not created unless the EPA has a reasonable basis to believe there has been a release of a hazardous substance and unless it (1) incurs costs with respect to a response or remedial action and (2) provides the person to whose property the lien attaches with written notice of potential liability. 42 U.S.C. § 9607(*l*)(2). Finally, in order to make the lien valid, the government must file a notice of lien in the appropriate state or local office. 42 U.S.C. § 9607(*l*)(3).

7. *See* 42 U.S.C. § 9607(*l*), which provides:
Federal Lien. (1) In general. All costs and damages for which a person is liable to the United States under subsection (a) of this section ... shall constitute a lien in favor of the United States upon all real property and rights to such property which—
(A) belong to such person; and
(B) are subject to or affected by a removal or remedial action.
(2) Duration. The lien imposed by this subsection shall arise at the later of the following:

(A) The time costs are first incurred by the United States with respect to a response action under this Act.
(B) The time that the person referred to in paragraph (1) is provided (by certified or registered mail) written notice of potential liability. Such lien shall continue until the liability for the costs (or a judgment against such person arising out of such liability) is satisfied or becomes unenforceable through operation of the statute of limitations provided in section 113 [42 U.S.C. § 9613].

In essence, the lien secures the government's right to reimbursement for expenditures made pursuant to its obligations under CERCLA.

*Application of Section 104*

▮ Plainly, none of the issues raised by Genzale are reviewable at this stage. Nor will this court enjoin the EPA from conducting the RI/FS. We hold that the EPA has met the burden imposed by CERCLA Section 104.

We find that Genzale's placement on the NPL, coupled with the 1981 and 1983 tests substantiating the release of heavy metal contaminants into wastewater and soil in and around the leaching pools on the Genzale property, is sufficient to fulfill the EPA's burden to show that its request for access is reasonable. The EPA need not show that there is an "imminent hazard to public health or welfare." This is but one of two standards set forth in CERCLA. Section 104 authorizes action both for releases or substantial threats of releases of "pollutant[s] which may present an imminent and substantial danger to public health or welfare," 42 U.S.C. § 9604(a)(1)(B), and "whenever any hazardous substance is released or there is a substantial threat of such a release into the environment...." 42 U.S.C. § 9604(a)(1)(A).

▮ The traditional equity rules regarding mandatory injunctive relief are not applicable in this context. They are displaced by CERCLA Section 104, which confirms that the government's request for access need only meet the threshold of reasonableness. 42 U.S.C. § 9604(e)(5)(B).[8]

## CONCLUSION

The court denies Genzale's request for injunctive relief and grants the EPA's request to compel access to the Genzale site

pursuant to the terms in the order which follows this opinion.

This memorandum of decision contains findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

## ORDER

Upon the motion for preliminary injunction by the United States of America, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (CERCLA), 42 U.S.C. §§ 9601–9675, the supporting Memorandum of Law and the declarations of Alison A. Hess and James F. Doyle, with attached exhibits, demonstrating sufficient justification for entry on property owned by defendants and located at 288 New Hyde Park Road, Franklin Square, New York (the Genzale Facility), and

Upon the court's finding that the plaintiff has demonstrated that 1) it has a reasonable basis to believe that a release has occurred or is threatened to occur at the Genzale Facility, and 2) under the circumstances of the case, EPA's requests for access and EPA's August 3, 1989 Administrative Order Directing Compliance with Request for Access, Index No. II CERCLA–90222 (Order), are not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, it is hereby

ORDERED that defendants comply with the August 3, 1989 Order and afford access to EPA and its authorized representatives for the purpose of conducting a remedial investigation of the Genzale Facility, and it is further

ORDERED that Defendants are enjoined and prohibited from interfering in any way with EPA and its authorized representatives during the remedial investigation field work at their property, and it is further

---

**8.** The legislative history of the 1986 Superfund amendments makes clear that traditional equity rules are not applicable in the context of a Section 104 request for access:
"The Committee has been concerned that EPA has had difficulty gaining access to facilities and gathering information or conducting cleanup activities necessary to achieve the goals of Su-

perfund. This provision [Section 104] clarifies and strengthens the authorities [sic] of EPA to achieve these tasks.
... EPA is required to begin RI and FS's for all NPL sites...."
H.Rep. 99–253, Part I, 99th Cong., 1st Sess. 70–71 (1985), U.S.Code Cong. & Admin.News 1986, pp. 2852–2853.

ORDERED that any authorized employee or representative of the EPA and its independent contractors and their subcontractors may enter on and into, move about and remain on or about defendants' property, which includes the Genzale Facility, located at 288 New Hyde Park Road, Franklin Square, New York, for the purposes of conducting a remedial investigation including but not limited to:

a) conducting geophysical surveys;

b) the installation of eight (8) ground water monitoring wells;

c) surface and subsurface soil sampling;

d) groundwater sampling; and

c) storm drain sampling.

The United States Marshal for the Eastern District of New York is authorized and directed to assist in such manner as may be reasonably necessary and required to execute this order and all the provisions contained herein.

The entry and activities authorized by this order must take place within 120 days from the date of entry. The date of entry shall be on or before November 10, 1989. Within these parameters, the EPA officials and authorized representatives may enter and conduct the necessary remedial investigation field work activities at whatever hours and on whatever days are deemed by them to be appropriate and advisable. During the above time period, the property may be entered and re-entered as needed.